Andrew Saltesz *v.* The Sovereign Camp of the Woodmen of the World, *a Corporation*

(No. 6911)

Submitted April 28, 1931.   Decided May 12, 1931.
(Rehearing denied July 24, 1931.)

*Brown, Jackson & Knight, Lon H. Kelly,* and *Herman Bennett,* for plaintiff in error.
*Claude L. Smith,* for defendant in error.

Maxwell, Judge:

The Sovereign Camp of the Woodmen of the World, a corporation, complains of verdict and judgment against it for $1,110.00 in favor of Andrew Saltesz, father of Andrew Saltesz, Jr., deceased, and beneficiary in a policy for $1,000.00 issued by the defendant on the life of the said decedent. The defense is predicated on alleged breach of warranties in the answers made by the decedent to questions propounded to him in his application for membership in the defendant.

Written application for said membership was made by the decedent the 16th of August, 1927, he then being of the age of eighteen years and ten months.  Pursuant to said application he was physically examined by a physician the 20th

of said month, and having been passed by the physician as physically fit a certificate of membership and insurance was issued and delivered to him the 6th of September, following. The insured died September 24, 1928.

In his said application there appeared specific and categorical inquiries as to whether the applicant had ever suffered from or had any of certain specified diseases or symptoms, among them "shortness of breath." To each of such questions he answered "No." To the question "Have you consulted or been attended by a physician for any disease or injury during the past five years?" he also answered "No." The application also contained a warranty by him that he was of sound bodily health and mind at the time of making the application. Upon the delivery of his certificate to him, September 6, 1927, he signed receipt containing, *inter alia,* this language: " * * * and warrant that I am in good health at this time and have not been sick or injured since the date of my application * * *."

The specific positions taken by the defense are: (a) that the applicant had consulted about his physical condition with a physician within five years prior to the date of the application; (b) that the applicant had suffered from shortness of breath and other symptoms of heart disease; (c) that he was not of sound bodily health when he made his said application; (e) that he was not in good health on the date of his receipt of his certificate of membership and insurance.

Dr. B. W. Eakin, a physician of Tams, West Virginia, said that in 1923 or 1924 he made a physical examination of Andrew Saltesz, Jr., he then being a boy in attendance at school, and "found a heart murmur and enlarged heart and apex beat." The doctor testified: "I told the boy that he had a heart condition there, and he could not be as active as other boys, and he would have to lead a more circumscribed life." The same physician further testified that in May, 1925, when Andrew, Jr., had applied for work with the corporation for which the witness was physician, he made a thorough physical examination of the boy and found him "just fairly well developed, very rudy, fair complexion, chest not extraordinarily well shaped, and the apex of the heart enlarged, a very

distinct murmur, and apex beat displaced over, below, and to the right of the normal position.'' The doctor testified further: ''I told the boy that he could not do any violent physical work; that he had a heart that had been injured, the valves had been injured; and that he would have to lead a more circumscribed life than the ordinary boy * * *.''

On the 30th of December, 1927, Andrew consulted with Dr. A. H. Griggs, a physician of Beckley, West Virginia. This physician testified that the boy had a chronic heart disease, and that the patient stated that he had had shortness of breath for four months. About the middle of July, 1928, Andrew consulted with Dr. R. D. Roller, a physician of Charleston, West Virginia, who, upon diagnosis, ascertained that the patient was suffering from pulmonary tuberculosis and leakage of the heart. Upon Dr. Roller's advice the boy was taken to a sanatorium where the doctor examined him on more than one occasion and ascertained that in addition to his other serious diseases the unfortunate boy was suffering from Bright's disease. Dr. A. S. Black, a physician of Charleston, saw the boy at Tams a few hours before his death. He considered that the patient died of tuberculosis and so stated in the death certificate prepared by him.

The form application to which Andrew subscribed contains a provision that the said application and all the provisions in the constitution, laws, and by-laws of the society should constitute the basis for and form a part of any beneficiary certificate that might be issued to the applicant by the defendant. The application contained this further statement: ''I hereby certify, agree and warrant that all the statements, representations and answers in this application, consisting of two pages as aforesaid, are full, complete and true, whether written in my own hand or not * * * and I agree that any untrue statements or answers made by me in this application, * * * or any concealment of facts in this application or to the examining physician, intentional or otherwise, * * * or any failure on my part to comply with the laws of the society, now in force or hereafter adopted, shall make my beneficiary certificate void, and all rights of any person or persons hereunder shall be forfeited.''

516

Dr. Eakin testified that he has found very few cases of tuberculosis where there was organic heart trouble; that with tuberculosis there may be found functional heart trouble, that is, "the heart doesn't function well, due to anemia—not enough blood—something of that sort—no real apparent pathological changes in the heart or heart tissues * * *." Dr. Black testified: "The man was dying when I saw him, and naturally his heart wasn't behaving very well. * * * Well, the condition in his lungs could have been caused—this was the terminal age of whatever disease he had. A failing heart could produce a great many of those symptoms in his lungs that tuberculosis would." And in reply to a question as to what part the heart disease may have played in the cause of Andrew's death, Dr. Black answered: "It could have contributed largely to the cause of his death."

Answers to questions in applications for life insurance are ordinarily deemed representations and not warranties, and in order to afford basis for avoidance of a policy on the ground of falsity of representation the same must appear to be material; but where the parties by their contract make such representations material, the courts must deal with them on that basis. *Harris* v. *Insurance Co.*, 86 W. Va. 638, 642. It will be noted from the above quoted language from the application involved in the instant case that the applicant's answers to questions were made material and of basic and vital importance in the contract between the applicant and the defendant.

When, in response to the question as to whether he had consulted or been attended by a physician within five years, the applicant answered in the negative, it may be assumed that he made such answer in entire good faith on the theory that he had not in fact sought professional advice of Dr. Eakin on either of the two occasions hereinabove mentioned. On the first occasion the doctor had examined Andrew as a school boy; and on the second occasion, as an incident to his application for employment, it seems to have been necessary for him to undergo a physical examination by the company physician. If, however, in the light of those facts, the applicant was warranted (and we do not think he was so war-

ranted) in saying that he had not consulted or been attended by a physician within the period of five years (meaning that he had not voluntarily sought such professional attention), he certainly was not warranted in failing to disclose the full facts in his application. As was clearly said in the *Harris Case, supra,* at page 645: "The insurance company was entitled to a full and honest disclosure of things about which it made inquiry. The manifest purpose of securing this information was to give the insurance company the opportunity to consult the physicians who had treated the plaintiff, with a view to getting as full and complete information as to her condition of health as was obtainable. By failing to disclose the facts in this regard in her application the company was denied this opportunity."

In the face of the evidence to the contrary, his denial in his application that he had had shortness of breath, and his express warranty that at the time of making his application he was of sound bodily health, constitute breaches of warranty. The fact that he may not have comprehended the full meaning of what he was saying, and that he may not have intended to deceive or make false representations, in no wise relieves the situation. Where statements in applications for life insurance are expressly stipulated to be warranties, it is the falsity of the statements which is the controlling factor, and not the intent with which they are made. "If the answers of the insured to the questions propounded to him in the application, which are made part of the policy, are by the policy warranted to be true, and if any of the answers are false in fact, the policy is thereby forfeited, though the answers were made in perfect good faith." *Marshall* v. *Insurance Association,* 79 W. Va. 121. In conformity: *Stockton* v. *Life Insurance Co.,* 105 W. Va. 240; *Harris* v. *Insurance Co., supra; Myers* v. *Life Insurance Co.,* 83 W. Va. 390; *Schwarzbach* v. *Protective Union,* 25 W. Va. 622; *Life Insurance Society* v. *Llewellyn,* 58 Fed. Rep. 940; *Moulor* v. *Life Insurance Co.,* 111 U. S. 335.

Because of failure of the insured to make full disclosure in his application with reference to the physical examinations which had been made of him by Dr. Eakin within five years

prior to the date of the application; and because of his having made a negative answer to the question as to whether he had palpitation of the heart; and because of his having warranted that he was in good health both at the time of making the application and at the time of receipt of policy, when as a matter of fact he was not, we are constrained to reverse the judgment of the trial court and set aside the verdict of the jury. The case will be remanded for a new trial.

*Reversed and remanded.*