282 S.E.2d 342

**John Albert POWELL, Jr.**

v.

**TIME INSURANCE COMPANY.**

**No. 18224.**

Supreme Court of Appeals of
West Virginia.

June 16, 1989.

---

H. John Rogers, Martinsville, for Powell, Jr.

Paul T. Tucker, Bachmann, Hess, B & Garden, Wheeling, for Time Ins. Co.

MILLER, Justice:

This is an appeal from a judgment of the Circuit Court of Wetzel County, rendered on March 17, 1987, which directed a verdict in favor of Time Insurance Company (Time) in an action brought by the plaintiff below, John Albert Powell, Jr., to recover life insurance benefits. The plaintiff contends that the lower court erred in directing the verdict. We find no error warranting reversal, and we affirm the judgment of the circuit court.

On January 19, 1983, John Albert Powell, Sr., father of the plaintiff, applied for a life insurance policy from Time through David Miles, an independent insurance agent in New Martinsville, Wetzel County. On the application, Mr. Powell denied having been treated for any respiratory disorder.[1] In addition, the application listed no regular physician for Mr. Powell and bore the following handwritten notation: "Applicant states he was *never* treated, or examined." (Emphasis in original). The application was signed by both Mr. Powell and Mr. Miles.

On January 21, 1983, Time referred Mr. Powell to Ricaredo Suyao, M.D., for a medical examination. The medical examination report form, furnished by Time and designated as "PART 2" of the application, contained negative responses to a number of questions concerning Mr. Powell's health

---

1. Negative responses were given to the following questions:

"To the best of your knowledge and belief has any person proposed to be insured within the past ten years:

"15. Ever had any indication, diagnosis, or treatment of:
 (a) The lungs or respiratory system including hayfever or other allergies, asthma, bronchitis, tuberculosis or emphysema?

\* \* \* \* \* \*

"17. Had any electrocardiogram, chest x-ray, or blood study of any kind or been hospital-confined in the past ten years? If yes, give name of physician or hospital, tests, and results."

history and medical treatment[2] and was signed by both Mr. Powell and Dr. Suyao. Although Dr. Suyao noted that Mr. Powell smoked one pack of cigarettes every three days, he found no evidence of any respiratory abnormality.

Time subsequently issued Mr. Powell a life insurance policy, dated January 21, 1983, providing for a death benefit of $25,000 and naming the plaintiff as the sole beneficiary. Mr. Miles received the policy on February 12, 1983, and delivered it to Mr. Powell on February 28, 1983.

On March 24, 1983, Mr. Powell died at the age of sixty-five. The death certificate listed carcinoma of the lung of two months' duration as the immediate cause of death, with pulmonary emphysema listed as an unrelated condition contributing to death. The plaintiff subsequently filed a claim against his father's life insurance policy. Time, however, refused to honor the policy and, instead, refunded to the plaintiff the premiums Mr. Powell had paid before his death.

In October, 1983, the plaintiff instituted a civil action in the Circuit Court of Wetzel County to recover the proceeds of the insurance policy. The complaint also sought compensatory and punitive damages on the ground that Time had acted in bad faith in refusing to honor the policy. In its answer, Time asserted that Mr. Powell had misrepresented the facts in his application, thereby barring recovery by the plaintiff.

Trial commenced in the circuit court in March, 1985, but ended in a mistrial. A second trial, limited by stipulation of the parties to the issue of Time's liability under the policy, was conducted before a jury on March 16 and 17, 1987.

The evidence at trial centered on Time's defense of misrepresentation. Mr. Miles testified that when Mr. Powell had appeared at his office to apply for the insurance policy, he seemed healthy, although he smoked heavily. Mr. Miles testified that he had personally asked Mr. Powell every question on the application and accurately recorded Mr. Powell's responses. Mr. Miles further testified that after completing the application, he gave it to Mr. Powell and read through it aloud before Mr. Powell signed it. Mr. Miles stated that Mr. Powell was referred to Dr. Suyao only after he asserted that he had never been examined by a doctor and asked Mr. Miles to recommend a physician for the required medical examination. Mr. Miles testified that he was unaware of Mr. Powell's illness until he visited him in the hospital on March 15, 1983.

Time also introduced evidence that Mr. Powell had sought treatment for breathing difficulties at the Veteran's Administration (VA) Hospital in Clarksburg as early as 1967, at which time he was given a chest x-ray and an electrocardiogram and was diagnosed as suffering from obstructive pulmonary emphysema. Records indicate that Mr. Powell returned to the VA Hospital with similar complaints in 1974, 1975, and 1977, and, after similar tests, was treated for pulmonary emphysema on each occasion. Dr. Arturo Mardones, a physician at the VA Hospital, testified that he had treated Mr. Powell for advanced pulmonary emphysema several times in 1981 and 1982 and had ordered chest x-rays on each occasion. Dr. Mardones characterized Mr. Powell's condition as chronic and of long standing, and testified that he had informed Mr. Powell several times that he had emphysema and should stop smoking.

---

2. The questions on the medical form included: "2. Have you ever been treated for or every [*sic*] had any known indication of:

\* \* \* \* \*

c. Shortness of breath, persistent hoarseness or cough, blood spitting, bronchitis, pleurisy, asthma, emphysema, tuberculosis or other respiratory disorder?

\* \* \* \* \* \*

"6. *Other than above,* have you within the past 5 years:

a. Had any mental or physical disorder not listed above?

b. Had a checkup, consultation, illness, injury, surgery?

\* \* \* \* \* \*

d. Had electrocardiogram, X-ray, other diagnostic test?" (Emphasis in original).

Time also offered evidence that on February 1, 1983, Mr. Powell had consulted Terry T. Tallman, M.D., complaining of a chronic cough and shortness of breath that had worsened in the previous two months. Dr. Tallman's notes indicate that Mr. Powell gave a history of chronic obstructive lung disease of two years' duration, for which he had been treated at the VA Hospital. Dr. Tallman referred Mr. Powell for x-rays and a biopsy, which confirmed his suspicions that Mr. Powell was suffering from lung cancer.

John Hildebrandt, manager of Time's underwriting department, testified that in determining whether to issue an insurance policy, Time relied on the information contained in the policy application and ordinarily conducted no independent investigation of the representations therein unless there was some indication that further information was needed. Mr. Hildebrandt testified that a notation of treatment by a physician within the previous five years would have triggered such an investigation and that Time would have required further information, such as a doctor's report, before approving the application. Mr. Hildebrandt also testified that the diagnosis of emphysema made Mr. Powell uninsurable and that had Time been aware of his long history of pulmonary disease, it would never have issued the policy.

The plaintiff presented evidence that Mr. Powell had a tenth-grade education, was occasionally employed as a house painter, and had an excellent reputation in the community for truthfulness. The plaintiff's evidence showed that Mr. Powell had never told family members that he was suffering from a respiratory condition and that emphysema and cancer are unrelated diseases. The plaintiff admitted that he had occasionally driven his father to the VA Hospital when he had a cold or for a checkup, but stated that until the diagnosis of lung cancer in March of 1983, the only serious medical problem his father had ever exhibited was a loss of hearing in the last year of his life.

The plaintiff also attempted to introduce evidence that his father had previously obtained a life insurance policy from another company, but had voluntarily allowed the policy to lapse in October, 1982. As the prior policy allegedly had been in effect long enough to have become incontestable by the insurer, the plaintiff argued that the evidence was relevant to demonstrate the absence of fraud on the part of Mr. Powell. The trial court, however, refused to allow the plaintiff to introduce this evidence.

At the close of the evidence, Time moved for a directed verdict. The circuit court found that the evidence showed material misrepresentations and/or omissions in the application and that Time, in good faith, would have refused to issue the policy had it been aware of the truth. On this basis, the court directed the jury to return a verdict in Time's favor.

I.

At common law, the effect of false statements made in an insurance application upon the validity of a policy was dependent, in large part, on whether such statements were characterized as warranties or representations. In *Myers v. Mutual Life Ins. Co. of New York*, 83 W.Va. 390, 395, 98 S.E. 424, 426 (1919), the Court stated the difference:

> "Representations are in their nature no part of the contract of insurance. Their relation thereto is collateral. They are facts presented to the insurer before or at the time of making the contract as a presentation of the elements upon which the risk is to be accepted or rejected. They furnish a basis for the contract on the faith of which it is entered into, and if false in any respect material to the risk the contract may be avoided. A warranty, on the other hand, is a part of the contract itself. It defines by way of particular stipulation and condition the precise limits of the obligations which the insurer undertakes to assume, and no liability can arise outside of such limits."

*See Cook v. Farmers Mut. Fire Ass'n of West Virginia*, 139 W.Va. 700, 81 S.E.2d 71 (1954).

Warranties had to be literally true, while representations needed only to be substan-

tially true. *Myers,* 83 W.Va. at 398, 98 S.E. at 427; *Logan v. Provident Sav. Life Assurance Soc'y of New York,* 57 W.Va. 384, 50 S.E. 529 (1905). The mere fact that a warranted statement was false afforded an insurer grounds for avoiding liability under the policy, without regard to the character of the statement or the knowledge or intent of the applicant at the time it was made. *Layfield v. Jefferson Standard Life Ins. Co.,* 120 W.Va. 564, 199 S.E. 450 (1938); *Shamblen v. Modern Woodmen of America,* 105 W.Va. 252, 142 S.E. 447 (1928); *Marshall v. Locomotive Engineers Mut. Life & Accident Ins. Ass'n,* 79 W.Va. 121, 90 S.E. 847 (1916); *Schwarzbach v. Ohio Valley Protective Union,* 25 W.Va. 622 (1885). A false representation, on the other hand, generally had to be shown to be material to the risk or fraudulently made before the insurer would be allowed to defeat the policy. *Christian v. State Farm Mut. Auto. Ins. Co.,* 144 W.Va. 746, 110 S.E.2d 845 (1959); *Clark v. Commercial Casualty Ins. Co.,* 107 W.Va. 380, 148 S.E. 319 (1929); *Woody v. Continental Life Ins. Co.,* 105 W.Va. 215, 141 S.E. 880 (1928); *Myers,* 83 W.Va. at 396, 98 S.E. at 426; *Schwarzbach,* 25 W.Va. at 655.

Warranties were not favored at common law, and courts would generally construe misstatements in insurance applications to be representations rather than warranties whenever possible. *See Layfield,* 120 W.Va. at 570, 199 S.E. at 453; *Myers,* 83 W.Va. at 396, 98 S.E. at 426; *Marshall,* 79 W.Va. at 127, 90 S.E. at 849; *Logan,* 57 W.Va. at 388, 50 S.E. at 530; *Schwarzbach,* 25 W.Va. at 654. However, when expressly stipulated as such in the insurance con-

tract, statements of fact in the application would be considered as warranties and strictly construed against the insured. *See Cook,* 139 W.Va. at 707–08, 81 S.E.2d at 76; *Saltesz v. Sovereign Camp of Woodmen of the World,* 110 W.Va. 513, 159 S.E. 513 (1931); *Shamblen,* 105 W.Va. at 258, 142 S.E. at 449.

All of this was limited by the statutory rule that unless the application was attached to and made a part of the policy, the insurance company could not rely on any misrepresentations in the application to avoid liability. We spoke to this point in *Leftwich v. Inter–Ocean Casualty Co.,* 123 W.Va. 577, 580, 17 S.E.2d 209, 210 (1941), where we said: "Construing and applying this statute [W.Va.Code, 33–6–2 (1931)], *Bowyer v. Casualty Co.,* 72 W.Va. 333, 78 S.E. 1000, holds that an application for insurance in order to be a part of the insurance contract must be attached to the policy[.]" This provision is currently found in W.Va.Code, 33–6–6(a) (1957).[3]

## II.

■ The common law rules with regard to false statements in an application for an insurance policy must now be read in light of W.Va.Code, 33–6–7 (1957).[4] Oddly enough, this provision has not been given any extensive review by this Court. We do have several federal district court cases where it is stated, without any analysis of our prior law or the statute itself, that W.Va.Code, 33–6–7, does not alter the common law with respect to misrepresentations in the application for insurance. *See State*

---

**3.** W.Va.Code, 33–6–6(a) (1957), provides:

"No application for the issuance of any life or accident and sickness insurance policy or contract shall be admissible in evidence in any action relative to such policy or contract, unless a true copy of the application was attached to or otherwise made a part of the policy when issued. This subsection shall not apply to industrial life insurance policies."

**4.** W.Va.Code, 33–6–7 (1957), states:

"All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not

warranties. Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless:

"(a) Fraudulent; or

"(b) Material either to the acceptance of the risk, or to the hazards assumed by the insurer; or

"(c) The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise."

*Farm Mut. Auto. Ins. Co. v. Riffe,* 325 F.Supp. 190 (S.D.W.Va.1971); *Federal Mut. Ins. Co. v. Deal,* 239 F.Supp. 618 (S.D.W.Va.1965).

It should be noted that our statute appears not to be unique. It is substantially similar to the statute considered by the Maine Supreme Court in *American Home Assurance Co. v. Ingeneri,* 479 A.2d 897 (Me.1984).[5] There, the court, after reviewing the common law distinction between warranties and representations, focused on the following statutory language: "All statements and descriptions in any application for insurance ... shall be deemed to be representations and not warranties." In *Ingeneri,* the court concluded that one of the purposes of the statute was to abolish the common law concept of warranties in insurance applications. *See also Smith v. Republic Nat'l Life Ins. Co.,* 107 Ariz. 112, 483 P.2d 527 (1971); *Pearce v. Union Bankers Ins. Co.,* 259 So.2d 81 (La.App. 1972). *See generally* 12A J. Appleman, *Insurance Law & Practice* §§ 7251, 7253 (1981); 7 *Couch on Insurance 2d* § 35:17 (Rev. ed. 1985).

The plain language of our statute brings us to the same conclusion. We, therefore, hold that W.Va.Code, 33–6–7 (1957), has abolished the common law concept of warranties with regard to statements by an insured in an application for insurance. Cases such as *Christian v. State Farm Mut. Auto. Ins. Co.,* 144 W.Va. 746, 110 S.E.2d 845 (1959); *Kent v. General American Life Ins. Co.,* 120 W.Va. 58, 195 S.E. 670 (1938); *Shamblen v. Modern Woodmen of America,* 105 W.Va. 252, 142 S.E. 447 (1928), and *Myers v. Mutual Life Ins. Co. of New York,* 83 W.Va. 390, 98 S.E. 424 (1919), are overruled to the extent that they express a contrary view.

Furthermore, it is generally agreed that such statutes, which are designed to alleviate the harshness of the common law, are to be liberally construed in favor of the insured. *See Vernon v. Aetna Ins. Co.,* 301 F.2d 86 (5th Cir.), *cert. denied,* 371 U.S. 819, 83 S.Ct. 33, 9 L.Ed.2d 59 (1962); *Patrons Mut. Ins. Co. v. Rideout,* 411 A.2d 673 (Me.1980); *Sterling Ins. Co. v. Dansey,* 195 Va. 933, 81 S.E.2d 446 (1954). *See generally* 12A Appleman, *supra,* §§ 7251, 7253; 7 *Couch, supra,* § 35:22; 45 C.J.S. *Insurance* §§ 473(4)(d), 595b. (1946); 43 Am.Jur.2d *Insurance* § 1034 (1982).

It is apparent that the legislature, in enacting W.Va.Code, 33–6–7, intended to codify the circumstances in which an insurance policy could be revoked for misrepresentations made in the application. The second sentence in the statute sets the general rule: "Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless...." Clearly, this language is designed to indicate that not all misrepresentations will avoid the policy, but only those specifically identified in subsections (a), (b), and (c) of the statute.[6] Moreover, it is a general rule of statutory construction that subsidiary clauses which limit the generality of a rule are to be narrowly construed, as they are exceptions to it. *See Jackson v. City of Kansas City,* 235 Kan. 278, 680 P.2d 877 (1984); *Martin v. Rent Control Bd. of Cambridge,* 19 Mass.App. 745, 477 N.E.2d 426 (1985); *State ex rel. Simpkins. v. Harvey,* 172 W.Va. 312, 305 S.E.2d 268 (1983). *See generally* 1A *Sutherland Statutory Construction* § 20:22 (4th ed. 1985); 2A *Sutherland Statutory Construction* § 47:11 (4th ed. 1984); 73 Am.Jr.2d *Statutes* § 313 (1974).

---

**5.** The Utah Supreme Court in *Berger v. Minnesota Mut. Life Ins. Co.,* 723 P.2d 388, 390 (Utah 1986), in discussing a statute substantially identical to W.Va.Code, 33–6–7, stated in note 2:

"Our statute is essentially identical to Okla. Stat. tit. 36, § 3609 (1981), and Idaho Code § 41–1811 (1977 ed.), *see Industrial Indemnity Co. v. United States Fidelity & Guar. Co.,* 93 Idaho 59, 454 P.2d 956, 959 (1969). Similar provisions regarding the materiality of a mis-

representation are also found in other states' statutes, *e.g.,* Ill.Rev.Stat. ch. 73, § 766 (1965); Or.Rev.Stat. § 743.042(1) (1984); Colo.Rev. Stat. § 10–8–111(2) (1973)."

**6.** For convenience, we have used the term "misrepresentations" to refer to the "omissions, concealments of facts, and incorrect statements" specified in the statute, as these terms tend toward the same meaning.

The three statutory exceptions that will give rise to the right to avoid an insurance policy are stated in the alternative, but carry some duplication. The first, contained in W.Va.Code, 33–6–7(a), arises where the representation is "fraudulent." We have recognized in our prior law that "[f]raud on the part of the insured in the procurement of the policy . . . is sufficient to defeat a recovery in an action on such policy." *Christian v. State Farm Mut. Auto. Ins. Co.,* 144 W.Va. at 753, 110 S.E.2d at 849–50. It does not appear that we have had occasion to define what acts will constitute fraud in this context. Our traditional rule with regard to fraud is found in Syllabus Point 1 of *Lengyel v. Lint,* 167 W.Va. 272, 280 S.E.2d 66 (1981):

> "The essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.' *Horton v. Tyree,* 104 W.Va. 238, 242, 139 S.E. 737 [738] (1927)."

*See also Muzelak v. King Chevrolet, Inc.,* 179 W.Va. 340, 368 S.E.2d 710 (1988).

This rule does not differ markedly from what other courts have considered fraud sufficient to avoid an insurance policy, "usually consisting of knowingly or wilfully making false statements with the intention of deceiving or defrauding the insurer." 12A Appleman, *supra* at 390.[7] Moreover, in accordance with our rule in *Lengyel,* it is also generally agreed that fraudulent misrepresentations must relate to a material fact and that the insurer must have had no knowledge of their falsity. 12A Appleman, *supra* § 7303.[8] Indeed, because false representations partake of fraud, many courts do not make any clear distinction between a false representation and a fraudulent one. Typical is *Hollinger*

*v. Mutual Benefit Life Ins. Co.,* 192 Colo. 377, 381, 560 P.2d 824, 827 (1977), where the court stated:

> "[I]n order to avoid a life insurance policy on the basis of misrepresentations in the application, the insurer must prove that (1) the applicant made a false statement of fact or concealed a fact in his application for insurance; (2) the applicant knowingly made the false statement or knowingly concealed the fact; (3) the false statement of fact or the concealed fact materially affected either the acceptance of the risk or the hazard assumed by the insurer; (4) the insurer was ignorant of the false statement of fact or concealment of fact and is not chargeable with knowledge of the fact; (5) the insurer relied, to its detriment, on the false statement of fact or concealment of fact in issuing the policy." (Footnote omitted).

We have in the past adopted a similar rule which closely parallels *Lengyel's* general definition of fraud, as indicated by Syllabus Point 1 of *Woody v. Continental Life Ins. Co., supra:*

> "A misrepresentation in insurance is a false representation of a material fact by one of the parties to the other, tending directly to induce such other to enter into the contract, or to do so on less favorable terms to himself, when without such representation such other party might not have entered into the contract at all, or done so on different terms."

■ Consequently, we hold that in order to be fraudulent under W.Va.Code, 33–6–7(a), misrepresentations, omissions, concealments of facts, and incorrect statements on an application for insurance by an insured must be knowingly made with an intent to deceive the insurer and relate to material facts affecting the policy.

When we turn to subsections (b) and (c) of the statute, there appears to be some

---

7. *See Gomogda v. Prudential Ins. Co. of America,* 31 Colo.App. 154, 501 P.2d 756 (1972); *Insurance Co. of the West v. Dills,* 145 Ga.App. 183, 243 S.E.2d 549 (1978); *Bynum v. Signal Life Ins. Co.,* 522 S.W.2d 696 (Tex.Civ.App.1975); *Christian v. State Farm Mut. Auto. Ins. Co., supra.*

8. *See Peek v. Southern Guar. Ins. Co.,* 240 Ga. 498, 241 S.E.2d 210 (1978); *Kentucky Cen. Life Ins. Co. v. Combs,* 432 S.W.2d 415 (Ky.1968); *Willis v. Colonial Life & Accident Ins. Co.,* 353 So.2d 480 (La.App.1977).

duplication. W.Va.Code, 33–6–7(b), relates to misrepresentations that are "[m]aterial either to the acceptance of the risk, or the hazard assumed by the insurer." Ordinarily, in determining whether a misrepresentation is material to the risk or the hazards assumed by the insurer, courts will utilize a test that is explained in 12A Appleman, *supra* at 368:

"The most general accepted test of materiality is whether or not the matter misstated could reasonably be considered material in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, or in fixing the premium rate thereon."

*See also Fecht v. Makowski,* 172 So.2d 468 (Fla.App.1965); *General Assurance Corp. v. Roberts,* 92 Ga.App. 834, 90 S.E.2d 70 (1955); *American States Ins. Co. v. Ehrlich,* 237 Kan. 449, 701 P.2d 676 (1985); *Maryland Indem. & Fire Ins. Exch. v. Steers,* 221 Md. 380, 157 A.2d 803 (1960); *Transamerican Ins. Co. v. Austin Farm Center, Inc.,* 354 N.W.2d 503 (Minn.App. 1984); *Mutual of Omaha Ins. Co. v. Dingus,* 219 Va. 706, 250 S.E.2d 352 (1979); *Berger v. Minnesota Mut. Life Ins. Co.,* 723 P.2d 388 (Utah 1986). W.Va.Code, 33–6–7(c), closely follows this language, providing that a misrepresentation is material if the insurer

"in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required by the application for the policy or otherwise."[9]

▮ Consequently, we hold that under W.Va.Code, 33–6–7(b) and (c), in order for a misrepresentation to be material, it must relate to either the acceptance of the risk insured or to the hazards assumed by the insurer. Materiality is determined by whether the insurer in good faith would either not have issued the policy, or would

not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

▮ It should be noted that these subsection (c) criteria are based on an objective standard that an "insurer in good faith" would have taken alternative action had the "true facts been known." Appleman observes that three different tests have evolved to determine whether a fact is regarded as material: "(1) whether a fact is regarded material by all similar insurers (2) what a reasonable and prudent insurer would regard as material (3) whether a particular individual insurer regarded the undisclosed facts as material to the contract." 12A Appleman, *supra* at 314. It is apparent that W.Va.Code, 33–6–7, adopts the test of whether a reasonably prudent insurer would consider the misrepresentation material to the contract.

There is little doubt that W.Va.Code, 33–6–7, changes our prior law with respect to materiality. It was formerly held that where a specific answer was sought on an application, the fact elicited thereby became a material one. *See* Syllabus, *Faulkiner v. Equitable Life Ins. Co.,* 144 W.Va. 193, 107 S.E.2d 360 (1959); Syllabus Point 2, *Woody v. Continental Life Ins. Co., supra.* The statute clearly confines materiality to the circumstances described in subsection (c).

### III.

▮ In this case, Time relies on the provisions of W.Va.Code, 33–6–7(c), arguing that it "in good faith would ... not have issued the policy ... if the true facts had been made known" by Mr. Powell. It is generally held that where an insurer seeks to avoid the policy based on a material misrepresentation, this assertion is in the nature of an affirmative defense which the insurer must prove by a preponderance of the evidence. *See Houseman v. Home Ins.*

---

**9.** The last phrase makes the obvious point that the misrepresentation must be in response to a specific question in the policy application.

*Co.,* 78 W.Va. 203, 88 S.E. 1048 (1916); *Logan v. Provident Sav. Life Assurance Soc'y of New York,* 57 W.Va. at 390, 50 S.E. at 531. *See generally* 21 J. Appleman, *Insurance Law & Practice* § 12122 (1980); 21A J. Appleman, *Insurance Law & Practice* § 12428 (1980).

 There can be little question that Time presented substantial evidence that Mr. Powell had made a number of misstatements in his application for insurance. The application indicated that Mr. Powell had never had (1) indications of lung or respiratory problems; (2) chest x-rays, electrocardiograms, blood studies, or hospital confinement; (3) shortness of breath, emphysema, or other respiratory disorders; or (4) a prior medical examination.[10] Time produced medical records showing that Mr. Powell was treated at the VA Hospital as early as 1967 for obstructive pulmonary emphysema, a diagnosis which was confirmed by chest x-rays and electrocardiograms obtained from Mr. Powell during recurring visits after 1974. A physician at the VA Hospital also indicated that he had treated Mr. Powell for advanced pulmonary emphysema several times in 1981 and 1982 and had ordered x-rays taken at those times.

In addition, the fact that Mr. Powell received frequent treatment for the disease over a long period of time and had been advised that he had emphysema several times within the applicable period is considered strong evidence that he knew or reasonably should have known of the existence of the disease at the time he filled out the application. *See Piccinini v. Teachers Protective Mut. Life Ins. Co.,* 316 Pa.Super. 519, 463 A.2d 1017 (1983); *Dye v.*

*Pennsylvania Casualty Co.,* 128 W.Va. 112, 35 S.E.2d 865 (1945); *Kent v. General American Life Ins. Co.,* 120 W.Va. at 61, 195 S.E. at 671–72; *Leadman v. Aetna Life Ins. Co.,* 112 W.Va. 53, 163 S.E. 716 (1932); *Saltesz v. Sovereign Camp of Woodmen of the World,* 110 W.Va. at 514–15, 159 S.E. at 513–14. *See generally* 1A J. Appleman, *Insurance Law & Practice* § 247 (1981); 21A Appleman, *supra* § 12430. Moreover, Dr. Tallman's notes state that Mr. Powell gave a history of chronic pulmonary disease of two years' duration less than two weeks after filling out the application. These factors indicate that the misrepresentation was not unintentional.

Finally, Time also offered evidence that if it had known Mr. Powell suffered from chronic obstructive pulmonary emphysema, it would not have issued the policy. This evidence was uncontradicted and there can be little question that the information was material to the risk insured, i.e., Mr. Powell's life. Moreover, while lung cancer and pulmonary emphysema are not related diseases, they can be caused by many of the same factors, including cigarette smoking. *See Gray's Attorneys' Textbook of Medicine* ¶ 204.33 (3d ed. 1987); *Lawyers' Medical Cyclopedia,* §§ 33.45, 33.58, 33.75 (3d ed. 1984).

We believe that Time not only met its burden of proving a material misrepresentation, but, in the absence of any controverting evidence, was entitled to a directed verdict. Our law with regard to a directed verdict is set out in Syllabus Point 3 of *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964):

---

**10.** None of these misrepresentations could be termed matters of opinion, which we have traditionally excused if made in good faith, as illustrated by Syllabus Point 1, in part, of *Layfield v. Jefferson Standard Life Ins. Co., supra:* "A mistake in the expression of an opinion in an answer to a question in an application for an insurance policy, made in good faith, will not vitiate the policy." The question in *Layfield* was whether the applicant was "of sound constitution, temperate habits and in good health." 120 W.Va. at 566, 199 S.E. at 452.

Nor is there any claim here that the agent had incorrectly inserted wrong facts on the application. Such a situation would trigger the rule in Syllabus Point 1 of *McDonald v. Beneficial Standard Life Ins. Co.,* 160 W.Va. 396, 235 S.E.2d 367 (1977):

"'If the facts regarding the risk are correctly stated to the agent of an insurance company but erroneously inserted by him in the application, the company is chargeable with his error or mistake....' *Syllabus, Bays v. Farmers' Mutual Fire Association of West Virginia,* 114 W.Va. 164, 171 S.E. 253 (1933)."

"When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right of recovery, the trial court should direct a verdict in favor of the defendant."

See also *Troy Mining Corp. v. Itmann Coal Co.,* 176 W.Va. 599, 346 S.E.2d 749 (1986); *Hinkle v. Martin,* 163 W.Va. 482, 256 S.E.2d 768 (1979).

### IV.

We find that the trial court was correct in directing a verdict for the defendant at the close of the evidence. The judgment of the Circuit Court of Wetzel County is, therefore, affirmed.

Affirmed.

McGRAW, J., participated in this decision, but departed from the Court prior to the preparation of the opinion.

WORKMAN, J., did not participate in the consideration or decision of this case.