564 S.E.2d 408

**CB&T OPERATIONS COMPANY, INC. and CB&T Financial Corp., Petitioners Below, Appellants,**

v.

**TAX COMMISSIONER OF THE STATE OF WEST VIRGINIA, Respondent Below, Appellee.**

No. 29560.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 2001.

Decided Feb. 25, 2002.

Stephen R. Brooks, Flaherty, Sensabaugh & Bonasso, P.L.L.C., Morgantown, West Virginia, Attorney for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Stephen B. Stockton, Senior Assistant Attorney General, Charleston, West Virginia, Attorneys for the Appellee.

McGRAW, Justice:

Appellants in this case, CB & T Operations Company, Inc., ("CB & T Operations"), and its parent company, CB & T Financial Corp. ("CB & T Financial"), challenge the circuit court's rulings upholding assessments against them for use tax imposed by the Tax Commissioner of the State of West Virginia ("Tax Commissioner") pursuant to W. Va. Code § 11–15A–2 (1989) (Repl.Vol.1995), in connection with appellants' ostensible lease of data-processing equipment and related software from one of CB & T Financial's bank subsidiaries. We reverse, finding that the transactions at issue are exempt from use tax pursuant to W. Va.Code § 11–15A–3(a)(2) (1987) (Repl.Vol.1995) and W. Va.Code § 11–15–9(a)(24) (2001) (Supp.2001), which exempt services provided among commonly-controlled business enterprises.

I.

## BACKGROUND

CB & T Financial was a bank holding company that provided administrative and other services to its numerous subsidiary banks.[1] Prior to 1991, the data processing for CB & T Financial's affiliates was done by one of these subsidiaries, Community Bank & Trust, National Association ("CB & T Bank"). In an effort to permit the management of CB & T Financial to more accurately

---

1. Following the tax assessments in question, CB & T Financial was acquired by Huntington Banc-

shares Inc., and was later merged into one of Huntington's wholly-owned subsidiaries.

track the cost of data-processing services with respect to each of its bank affiliates—and thus make more efficient decisions regarding the continued provision, or possible out-sourcing, of those services—CB & T Operations was incorporated in early 1991 as a wholly-owned subsidiary of CB & T Financial. The exclusive function of CB & T Operations was to assume, at least on paper, the data-processing work formerly shouldered by CB & T Bank.

In order to carry out its assigned task, CB & T Operations leased property already owned by CB & T Bank, which included data-processing equipment and related software, office furniture, leasehold improvements to a building located in Fairmont, West Virginia, and several automobiles.[2] This arrangement was documented through a series of written lease agreements whereby CB & T Operations, as lessee, agreed to make monthly lease payments to CB & T Bank, as lessor, of $70,000 during 1991, and $80,000 throughout 1992.[3] The monthly lease payments were calculated by adding the annual depreciation and amortization costs of the leased property together with a fair-market rate of interest on the net book value of the property,[4] and then dividing the aggregate figure by twelve months and rounding up. This formula resulted in estimated monthly costs of $53,220.61 for 1991, and $78,494.68 in 1992. In addition to these lease payments, CB & T Operations was also required under the leases to bear the full cost of all expenses incurred in connection with the leased property, including taxes, insurance, repairs, and maintenance.[5]

In April 1992, it was decided that CB & T Financial would nominally assume some of the data-processing work that had previously been transferred to CB & T Operations. Although the lease in effect between CB & T Operations and CB & T Bank was not formally modified, CB & T Financial began to make monthly payments of $16,000 in connection with its use of the leased property. Payments made by CB & T Operations under its lease agreements with CB & T Bank were reduced accordingly.

Effective February 28, 1993, the lease arrangement in question was terminated, and Mellon Bank was contracted to perform the data-processing work for CB & T Financial's affiliates. CB & T Operations was later formally dissolved in June 1994.

Following an audit by the Auditing Division of the State Tax Department of West Virginia, the Tax Commissioner on August 27, 1993 issued use tax assessments against both CB & T Operations and CB & T Financial in connection with the lease payments detailed above. The amount of the use tax assessed against CB & T Operations, for the period from January 1, 1991 through February 28, 1993, was $129,167. Interest computed for the same period, amounting to $12,583, was added for a total tax liability of $141,750. The amount of the use tax assessed against CB & T Financial, for the period from January 1, 1991 through March 31, 1993, was $16,014. Interest computed for the same period, amounting to $930, was added for a total liability of $16,944.

After receiving written notification of these tax assessments, CB & T Operations and CB

2. The Tax Commissioner determined that neither the leasehold improvements nor the automobiles were subjected to use tax, and thus neither of these two categories of property figure into the present case.

3. There was no written lease agreement for 1993, apparently because it had already become evident by late 1992 that CB & T Operations would cease operations in the first quarter of 1993.

4. The interest rate applicable during the 1991 lease period was eleven percent, while during 1992 interest was charged at a rate of nine percent. The Court takes judicial notice of the fact that these interest rates roughly approximat-ed the prime interest rates prevailing during the year preceding each lease term. See Federal Reserve Statistical Release H.15, Selected Interest Rates (various dates), *available at* http://www.federalreserve.gov/releases/H15/data/d/prime.txt.

5. There is evidence in the record that notwithstanding the terms of the 1991 lease agreements, CB & T Bank continued to shoulder these additional cost throughout that year. This apparently explains the substantial disparity between the calculated monthly costs for 1991 ($53,220.61), and the amount actually paid under the lease ($70,000), as it was agreed that the difference would cover such maintenance expenses.

& T Financial each filed timely petitions for reassessment. The petitions were consolidated and a hearing was subsequently held on April 18, 1994. By a decision issued on June 25, 1997, the Administrative Law Judge ("ALJ") found, in part, that the subject transactions generated a profit for CB & T Bank, and thus qualified as "business" activity subject to use tax under Chapter 11, Article 15A of the West Virginia Code. The ALJ also rejected appellants' argument that the transactions were subject to the exemption for services provided by commonly-controlled business enterprises as set forth in W. Va. Code §§ 11–15A–3(a)(4) & 11–15–9(a)(24), finding that the transactions did not involve the "dispensing of a service, but rather a sale."

Appellants later sought judicial review in the Circuit Court of Marion County, and by an order entered on September 8, 2000, the lower court upheld the decision of the Tax Commissioner. It is from this order that appellants now appeal.

## II.

### STANDARD OF REVIEW

■■ The present appeal arises under W. Va.Code § 11–10–10 (1986) (Repl.Vol.1999). As this Court stated in syllabus point three of *Frymier–Halloran v. Paige*, 193 W.Va. 687, 458 S.E.2d 780 (1995),

> The same standard set out in the State Administrative Procedures Act, W. Va. Code, 29A–1–1, *et seq.*, is the standard of review applicable to review of the Tax–Commissioner's decisions under W. Va. Code, 11–10–10(e) (1986). Thus, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.

"Once a full record is developed, both the circuit court and this Court will review the findings and conclusions of the Tax Commissioner under a clearly erroneous and abuse of discretion standard unless the incorrect legal standard was applied." Syl. pt. 5, *id.* As we further explained in syllabus point three of *In re Queen*, 196 W.Va. 442, 473 S.E.2d 483 (1996), "[t]he 'clearly wrong' and

the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis."

■■ The Court's consideration of issues of law is much less deferential, however, as we have consistently adhered to the rule that "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995); *accord* syl. pt. 1, *In re Tax Assessment Against American Bituminous Power Partners, L.P.*, 208 W.Va. 250, 539 S.E.2d 757 (2000). Yet even in this sphere we are not entirely free to substitute our own judgment for that of an administrative agency, as "[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." Syl. pt. 4, *Security Nat'l Bank & Trust Co. v. First W. Va. Bancorp., Inc.*, 166 W.Va. 775, 277 S.E.2d 613 (1981).

## III.

### DISCUSSION

#### A. Transactions as Taxable Events Based Upon Accrual of Economic Gain

Appellants first argue that the transactions in question, to the extent they may be deemed to involve the use of tangible personal property, are not subject to tax because CB & T Bank was not engaged in the "business" of leasing data processing equipment, as required in order for the transactions to be taxable under Chapter 11, Article 15A of the West Virginia Code. Specifically, they contend that the transactions were aimed merely to facilitate more accurate accounting of the aggregate cost of data-processing within the larger organization, and were never intended to realize a profit for any of the firms involved.

Appellants' argument requires careful parsing of the relevant statutory text defining the use tax. West Virginia Code § 11–

15A–2(a) & (b) (1989) (Repl.Vol.1995) [6] impose a tax on the "use" [7] of, among other things, "tangible personal property," the latter phrase being defined to encompass "tangible goods, wares and merchandise when sold by a retailer for use in this state." W. Va.Code § 11–15A–1(12) (1986) (Repl.Vol. 1995). The term "retailer," in turn, is defined as "every person engaging in the business of selling, leasing, or renting tangible personal property for use within the meaning of this article." W. Va.Code § 11–15A–1(7). Finally, the term "business" refers to "any activity engaged in by any person . . . with the object of direct or indirect economic gain, benefit or advantage, and includes any purposeful revenue generating activity in this state." W. Va.Code § 11–15A–1(1).

■ With an eye to this statutory language, appellants assert that none of the lease transactions in question were entered into "with the object of direct or indirect economic gain, benefit or advantage," and therefore do not qualify as taxable events under W. Va.Code § 11–15A–2(a) & (b). We disagree.

This Court had occasion to construe nearly identical statutory language in *Southern States Coop., Inc. v. Dailey,* 167 W.Va. 920, 280 S.E.2d 821 (1981). In *Dailey,* the Tax Commissioner had assessed business and occupation tax against an agricultural cooperative association, Southern States Coopera-

tive, Inc., based upon the transfer of goods from Southern States to its local affiliated cooperatives in West Virginia. Southern States acted as a central purchaser of goods for both its own chain of branch stores, as well as the local affiliated cooperatives, the latter of which were formed as separate legal entities under Virginia law. Southern States charged its local affiliates only the actual cost of the goods transferred, including overhead and other related expenses.

Southern States responded to the tax assessment by arguing, *inter alia,* that it was not subject to tax because it was not engaged in a "business" within the meaning of W. Va.Code § 11–13–1 (1972) (Repl.Vol.1987),[8] which term was defined to include "all activities engaged in or caused to be engaged in with the object of gain or economic benefit, either direct or indirect." 167 W.Va. at 931, 280 S.E.2d at 827–28. The Tax Commissioner prevailed at the administrative level, but the decision was subsequently overturned in circuit court, with the lower court ruling that the profit-neutral transfers of goods to the local affiliates were not subject to tax because Southern States realized no profit from the transactions. This Court later reversed, giving the phrase, "gain or economic benefit" broad meaning:

> It cannot seriously be contended that Southern States derives no gain or economic benefit from its wholesale transac-

---

**6.** W. Va.Code § 11–15A–2(a) & (b) state:

> (a) An excise tax is hereby levied and imposed on the use in this state of tangible personal property or taxable services, to be collected and paid as hereinafter provided, at the rate of six percent of the purchase price of such property or taxable services, beginning on the first day of March, one thousand nine hundred eighty-nine, except that sales of gasoline and special fuel shall remain taxable at five percent. "Taxable services," for the purposes of this article, means services of the nature that are subject to the tax imposed by article fifteen of this chapter. In this article, wherever the words "tangible personal property" or "property" appear, the same shall include the words "or taxable services," where the context so requires.
> (b) Such tax is hereby imposed upon every person using tangible personal property or taxable services within this state. That person's liability is not extinguished until such tax has been paid. A receipt with the tax separately

stated thereon issued by a retailer engaged in business in this state, or by a foreign retailer who is authorized by the tax commissioner to collect the tax imposed by this article, relieves the purchaser from further liability for the tax to which the receipt refers.

**7.** The term "use" is defined in Article 15A to

> include[ ] the exercise by any person of any right or power over tangible personal property incident to the ownership, possession or enjoyment of such property, or by any transaction in which possession of or the exercise of any right or power over tangible personal property is acquired for a consideration, *including any lease,* rental or conditional sale of tangible personal property. . . .

W. Va.Code § 11–15A–1(14) (emphasis added).

**8.** W. Va.Code § 11–13–1 has since been amended, with the relevant language now set forth without alteration in subsection (b)(6) of the statute. *See* 1989 W. Va. Acts, Reg. Sess., ch. 194.

tions with its affiliated cooperatives. It is true that the transfers of property from Southern States to its local cooperatives are made on an actual cost basis, and therefore Southern States derives no direct *profit* from the transaction. However, the statute here involved, W. Va.Code § 11–13–1, does not refer to "profit", but to "gain or economic benefit." Gain or economic benefit is a much broader term than profit, *see, e. g., Bonnar–Vawter, Inc. v. Johnson,* [157 Me. 380, 173 A.2d 141 (1961) ]; *State v. Zellner,* 133 Ohio St. 263, 13 N.E.2d 235 (1938), and includes the benefits Southern States receives from dealings with its cooperatives.

167 W.Va. at 931–32, 280 S.E.2d at 828 (emphasis in original).

■ Significantly, a definition for "business" was not included in W. Va.Code § 11–15A–1 until 1986,[9] and now essentially tracks the language of W. Va.Code § 11–13–1(b)(6). As this Court observed in syllabus point two, in part, of *Stephen L.H. v. Sherry L.H.,* 195 W.Va. 384, 465 S.E.2d 841 (1995),

When the Legislature enacts laws, it is presumed to be aware of all pertinent judgments rendered by the judicial branch. By borrowing terms of art in which are accumulated the legal tradition and meaning of centuries of practice, the Legislature presumably knows and adopts the cluster of ideas attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

Thus, in the absence of more reliable indicia of legislative intent, we must presume that the Legislature intended that the broad judicial interpretation given by the *Dailey* Court to the terms "gain" and "benefit" would apply with equal force in defining a "business" under § 11–15A–1(1).[10]

9. *See* 1986 W. Va. Acts, 2d Extraordinary Sess., ch. 6.

10. Indeed, the addition of language in § 11–15A–1(1) to the effect that the term "business" also "includes any purposeful revenue generating activity in this state," appears to borrow directly

In this case, evidence in the administrative record clearly supports the determination that CB & T Bank received economic gain or benefit from the transactions in question. Not only were appellants charged the actual costs associated with the leased property, but the leases further imposed an interest charge on the book value of such equipment. Appellant's representative at the administrative hearing on this matter described the rationale for this practice during the administrative hearing, stating that

the use of . . . money has value to us in the banking industry. If we sold this equipment to CB & T Operations Company, if they owned it, then they would have to pay [CB & T Bank] the book value, which is somewhere around a million dollars, more or less, and [the bank] would be able to invest that money at a current marketable rate of interest, which is what we, as a bank, do.

So, not only would we save the depreciation cost, but we would earn more money. So, the real cost to us of owning that equipment is the use of the money plus the depreciation . . . . And it's pretty clear, if we pushed it out of there, [or] if we had not bought it in the first place, that [the bank] *would make more profit* by the amount of the interest we could earn on the money that we spent . . . .

(Emphasis added.) It is clear from this statement that the interest imposed under the leases was intended to permit CB & T Bank to capture a profit on the transactions equivalent to what it could otherwise obtain by selling the data processing equipment and lending the proceeds at prevailing market rates. The realization of such profit obviously qualifies as an "economic gain, benefit or advantage" sufficient to cause the transactions in question to meet the definition of a "business" under § 11–15A–1(1).

Appellants further contend that in determining whether any gain or benefit was real-

from *Dailey's* observation that a firm's ability to reach a larger market "is in itself a gain, the economic consequences of which are realized in the larger sales of the corporation's products and reduced costs through bulk purchasing." 167 W.Va. at 933, 280 S.E.2d at 828–29.

ized from the lease transactions, the activities undertaken by CB & T Financial and its wholly owned subsidiaries should be considered as a whole. In this regard, appellants argue that there was no net financial impact upon the larger corporate group, pointing to the fact that financial reporting to the public is done only in connection with CB & T Financial. Appellants are, in effect, asking the Court to disregard the fact that the parties to the transactions were each established as separate legal entities.

■ On this point, *Dailey* is again instructive. In *Dailey*, Southern States similarly argued that there was no meaningful distinction to be made between itself and its local affiliates, where Southern States had contracted to manage each of the local cooperatives. The Court rejected this argument, finding that

> Southern States ... and its local cooperatives are separate legal entities within the meaning of W. Va.Code § 11–13–1. That section defines "persons," for purposes of the business and occupation tax, as including "any individual, firm, (or) copartnership ...." In this case, the local affiliated cooperatives and Southern States fall individually into the aforementioned categories as "persons" for business and occupation tax purposes. The designation "group or combination acting as a unit" contained in W. Va.Code § 11–13–1 is used to include business configurations not otherwise specifically denominated. When separate corporations fall into specific designations of taxable "persons" enumerated in W. Va.Code § 11–13–1, they do not constitute a "group or combination acting as a unit," despite the fact that they form part of a cooperative distribution system. Consequently, Southern States and its local cooperatives are individually taxable entities for business and occupation tax purposes. Business and occupation taxes are designed to reach virtually all business activities carried on within the state, *see Au-*

*tomobile Club of Washington v. State, Department of Revenue*, 27 Wash.App. 781, 621 P.2d 760 (1980), and a business ought not be permitted to avoid taxation merely because it is acting in concert with another.

167 W.Va. at 928–29, 280 S.E.2d at 826. The *Dailey* Court went on to observe that "Southern States and its cooperatives have made a conscious decision to do business in the corporate form with its attendant advantages. These advantages include the limitation of personal liability, the continuity of corporate existence, *and the facilitation of business administration....* Having taken advantage of the benefits of incorporation, a corporation cannot decline to accept the liabilities of the corporate form in order to reduce the incidence of taxation." *Id.* at 929, 280 S.E.2d at 827 (emphasis added).

Appellants and CB & T Bank each clearly qualify as "persons" under Article 15A. *See* W. Va.Code § 11–15A–1(4).[11] And since the use tax is "imposed upon *every person* using tangible personal property or taxable services within this state," W. Va.Code § 11–15A–2(b) (emphasis added), we reject appellants' contention that they should be spared liability for use tax merely because the subject transactions involved affiliated corporate entities. In simpler terms, appellants will not be permitted to disregard their chosen corporate structure merely to suit the occasion.

In sum, the Court finds no merit in appellant's argument that the subject transactions fall outside the scope of W. Va.Code § 11–15A–2(a) & (b) based on the contention that no "economic gain, benefit or advantage" was derived from the transactions We therefore discern no error in the circuit court's refusal to grant relief on this basis.

**B.   *Transactions Subject to Exemption for Services Provided Between Commonly–Controlled Corporations***

■ Appellants further argue that even if the transactions at issue are otherwise tax-

---

**11.**   W. Va.Code § 11–15A–1(4) defines a "person" within the meaning of Article 15A to include "any individual, firm, partnership, joint venture, joint stock company, association, public or private corporation, cooperative, estate, trust, business trust, receiver, executor, administrator, any other fiduciary, any representative appointed by order of any court or otherwise acting on behalf of others, or any other group or combination acting as a unit, and the plural as well as the singular number."

able under W. Va.Code § 11–15A–2(a) & (b), they should be relieved of the obligation to pay use tax by operation of W. Va.Code § 11–15–9(a)(24) (2001) (Supp.2001), which provides an exemption for "services performed by one corporation, partnership, or limited liability company for another corporation, partnership, or limited liability company when the entities are members of the same controlled group . . . ." [12] In making this argument, appellants contend that while the subject transactions were documented in the form of lease arrangements, their substance in fact involved the provision of services. Appellants stress evidence in the record indicating that the transactions were merely a bookkeeping device aimed at facilitating more accurate accounting of data-processing costs, and that the leases were prepared simply in order to provide a corresponding audit trail.

The Tax Commissioner, while not contesting the fact that the business entities involved are part of the "same controlled group" for purposes of § 11–15–9(a)(24), responds by asserting that the exemption applies only with respect to the provision of "services," and not to transactions involving the "sale" of tangible personal property. Going further, the Tax Commissioner stresses the fact that the transactions were structured in the form of written leases, and posits that they should therefore be deemed to "involve[ ] the provision of rented personal property and not services." We think that the Tax Commissioner in this case exalts form over substance.

West Virginia Code § 11–15A–3(a)(2) (1987) (Repl.Vol.1995) exempts from the use tax items of tangible personal property or services that are otherwise exempt from the consumer sales tax. In this regard, W. Va. Code § 11–15–9(a)(24) provides an exemption for:

> Dispensing of *services* performed by one corporation, partnership or limited liability company for another corporation, partnership or limited liability company when the entities are members of the same controlled group or are related taxpayers as defined in Section 267 of the Internal Revenue Code. "Control" means ownership, directly or indirectly, of stock, equity interests or membership interests possessing fifty percent or more of the total combined voting power of all classes of the stock of a corporation, equity interests of a partnership or membership interests of a limited liability company entitled to vote or ownership, directly or indirectly, of stock, equity interests or membership interests possessing fifty percent or more of the value of the corporation, partnership or limited liability company[.]

(Emphasis added.) [13] The term "service" is defined to "include[ ] all nonprofessional activities engaged in for other persons for a consideration, which involve the rendering of a service *as distinguished from the sale of tangible personal property,* but shall not include contracting, personal services or the services rendered by an employee to his or her employer or any service rendered for resale." W. Va.Code § 11–15–2(s) (2001) (Repl.Vol.2001) (emphasis added). Giving substance to this distinction, a "sale" is separately defined to "include[ ] any transfer of the possession or ownership of tangible personal property for a consideration, including a lease or rental, when the transfer or delivery is made in the ordinary course of the transferor's business and is made to the transferee or his or her agent for consump-

---

12. Appellants present arguments bearing upon the effect of several other exemptions set forth in W. Va.Code § 11–15–9; however, because we reverse based upon the applicability of subsection of (a)(24), we need not address these arguments.

13. At the time of the transactions in question, a more limited version of this provision was codified at W. Va.Code § 11–15–9(cc) (1990 & 1991). The statute then provided an exemption from consumer sales tax and use tax for:

> Dispensing of services performed by one corporation for another corporation when both corporations are members of the same controlled group. Control means ownership, directly or indirectly, of stock possessing fifty percent or more of the total combined voting power of all classes of the stock of a corporation entitled to vote or ownership, directly or indirectly, of stock possessing fifty percent or more of the value of the corporation[.]

As the entities in question here are all corporations, the subsequent amendments to the statute do not alter our present analysis.

tion or use or any other purpose[.]" W. Va.Code § 11–15–2(r).

■ In contrast to instances where we are called upon to interpret statutes that affirmatively impose a tax, here we are dealing with a statute that purports to limit an otherwise generally applicable tax law. As to the former circumstance, this Court has consistently signaled its willingness to construe any ambiguity in favor of the taxpayer. *See, e.g., Consolidation Coal Co. v. Krupica,* 163 W.Va. 74, 80, 254 S.E.2d 813, 816 (1979) ("tax statutes are generally to be construed in favor of the taxpayer and against the taxing authority"). In cases involving the latter situation, however, we have indicated that " ' "[w]here a person claims an exemption from a law imposing a license or tax, such law is strictly construed against the person claiming the exemption." ' " Syl. pt. 2, *Tony P. Sellitti Constr. Co. v. Caryl,* 185 W.Va. 584, 408 S.E.2d 336 (1991) (citations omitted); *see also Wooddell v. Dailey,* 160 W.Va. 65, 68, 230 S.E.2d 466, 469 (1976) ("a tax law under which a person claims an exemption is strictly construed against the person claiming the exemption").[14] Thus, to the extent there is any ambiguity in the exemption for services provided between commonly-controlled corporations set forth in W. Va.Code § 11–15–9(a)(24), the statute must be given a narrow construction favoring taxation.

■ Section 11–15–9(a)(24) unquestionably does not exempt sales of tangible personal property among commonly-controlled corporations. The statutory definition of "service" clearly gives such term an exclusive meaning relative to a "sale." Consequently, to the extent that the transactions at issue in this case may be deemed to involve the "sale of tangible personal property," they would fall outside of the exemption provided by § 11–15–9(a)(24).

■ West Virginia Code § 11–15–6 (1987) provides that "[t]o prevent evasion, it shall be presumed that all sales and services are subject to the tax until the contrary is clearly established." In making such a clear showing, however, a taxpayer is not bound by the formal characterization given a particular transaction. No principle is more firmly embedded in this area of the law than the concept that it is the substance, not just the form, of a commercial transaction that determines its tax consequences. There is good reason for this rule, since it "promotes the public interest in tax certainty and thereby conforms with general business expectations." *General Trading Co., Inc. v. Director. Div. of Taxation,* 83 N.J. 122, 138, 416 A.2d 37 (1980). Thus, the characterization given to a particular transaction by the parties involved is not necessarily determinative of its treatment under the tax law. *See Footpress Corp. v. Strickland,* 242 Ga. 686, 687, 251 S.E.2d 278, 279 ("The substance of a transaction controls its tax treatment rather than the appellation chosen by the parties.") (citations omitted).

Giving effect to the substance of the transactions at issue, the Court finds that they are more appropriately placed under the rubric of services, rather than sales of tangible personal property. Again, the gravamen of a "sale" under W. Va.Code § 11–15–2(r) is the transfer of possession or ownership of tangible personal property for consideration. Although documented through written lease agreements concerning the equipment used in the data-processing operation, the record indicates that this equipment continued to be operated by the same employees of CB & T Bank who had previously done such work, at the same location. Appellant's representative stated at the administrative hearing that aside from the formal lease agreements and related accounting entries,

> "nothing else changed.... [T]he employees—it's still the same exact employees. We didn't—we don't have any officers for this newly formed company. Only we have some, but they are also—they wear two hats. And so nothing changed, and it was continued to be done under the same location. Just the accounting changed, is all.

It was further explained at the hearing that the sole purpose of the lease arrangement

---

**14.** This distinction flows in part from the canon of construction requiring the narrow reading of an exception which limits a rule of general applicability. *See Powell v. Time Ins. Co.,* 181 W.Va. 289, 295, 382 S.E.2d 342, 348 (1989) (citations omitted); *cf. State ex rel. Rist v. Underwood,* 206 W.Va. 258, 269–70, 524 S.E.2d 179, 190–91 (1999) (refusing to liberally construe exception to general prohibition set forth in Emoluments Clause of W. Va. Const. art. VI, § 15).

was to permit all of the data-processing costs to be aggregated under one company, CB & T Operations, thus allowing management to easily track such expenses on a daily basis by referring to computerized general ledger reports. This evidence was not rebutted by anything presented by the Tax Commissioner in proceedings before the ALJ.

We hold that under these circumstances, where the data-processing work continued to be performed by employees of the purported lessor at the same location it had been done prior to the transactions in question—in other words, where there was no transfer of possession_ of the subject property—the transactions more closely approximated the provision of services rather than the sale of tangible personal property.

Accordingly, we conclude that the ALJ's factual determination concerning the applicability of § 11–15–9(a)(24) was clearly erroneous, and therefore find that the circuit court erred in this case by failing to grant appropriate relief to appellants on this basis.

### IV.

### CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Marion County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.