# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**September 2022 Term**

_____

No. 21-0603

_____

**FILED**

**November 17, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**DAMON MCDOWELL,**
**MARY MCDOWELL, and DEEANNA LAWSON**
**Petitioners,**

v.

**ALLSTATE VEHICLE AND PROPERTY INSURANCE COMPANY and**
**PATRICK O. HAMBRICK, JR.,**
**Respondents.**

_____

**Appeal from the Circuit Court of Fayette County**
**The Honorable Paul M. Blake, Jr., Judge**
**Civil Action No. 19-C-129**

**REVERSED AND REMANDED**

_____

**Submitted: October 5, 2022**
**Filed: November 17, 2022**

Erwin L. Conrad, Esq.
Conrad & Conrad PLLC
Fayetteville, West Virginia
Counsel for the Petitioners

Brent K. Kesner, Esq.
Ernest G. Hentschel, II, Esq.
Kesner & Kesner, PLLC
Charleston, West Virginia
Counsel for the Respondents

**CHIEF JUSTICE HUTCHISON delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

2.      "W.Va. Code, 33-6-7 (1957), provides that '[m]isrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless. . . .'  This language indicates that not all misrepresentations will avoid an insurance policy, but only those specifically identified in subsections (a), (b), and (c) of the statute."  Syl. pt. 3, *Powell v. Time Ins. Co.*, 181 W. Va. 289, 382 S.E.2d 342 (1989).

3.      "Under W.Va. Code, 33-6-7(b) and (c) (1957), in order for a misrepresentation in an insurance application to be material, it must relate to either the acceptance of the risk insured or to the hazard assumed by the insurer.  Materiality is determined by whether the insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise."  Syl. pt. 5, *Powell v. Time Ins. Co.*, 181 W. Va. 289, 382 S.E.2d 342 (1989).

4. "W.Va. Code, 33-6-7 (1957), adopts the test of whether a reasonably prudent insurer would consider a misrepresentation material to the contract." Syl. pt. 6, *Powell v. Time Ins. Co.*, 181 W. Va. 289, 382 S.E.2d 342 (1989).

5. "[N]either West Virginia Code § 33-6-7(b) nor (c) [1957] requires that an insurer prove the subjective element that an insured specifically intended to place misrepresentations, omissions, concealments of fact, or incorrect statements on an application in order for the insurer to avoid the policy." Syl. pt. 6, in part, *Massachusetts Mut. Life Ins. Co. v. Thompson*, 194 W. Va. 473, 460 S.E.2d 719 (1995).

6. "Where an insurer seeks to avoid a policy based on a material misrepresentation, this assertion is in the nature of an affirmative defense which the insurer must prove by a preponderance of the evidence." Syl. pt. 7, *Powell v. Time Ins. Co.*, 181 W.Va. 289, 382 S.E.2d 342 (1989).

7. Under West Virginia Code § 33-6-7 (1957), the materiality of a misrepresentation on an application for an insurance policy is ordinarily a jury question. However, if the evidence excludes every reasonable inference except that the misrepresentation was material, then the question of materiality becomes one of law for the court.

**HUTCHISON, Chief Justice**:

West Virginia Code § 33-6-7(b) and (c) (1957) permit an insurer to rescind a policy if the insurer establishes that the application for the policy contains answers that are false and were material to the insurer's decision to issue the policy.

In this appeal from the Circuit Court of Fayette County, homeowner Damon McDowell ("McDowell") purchased an insurance policy from Allstate Vehicle and Property Insurance Company ("Allstate") for a derelict house McDowell intended to remodel. After a fire, Allstate sought to rescind the policy, claiming that McDowell digitally signed an application whereon he falsely answered a question regarding whether he would occupy the house within thirty days. McDowell contends that he never saw the application; never signed it; and that his answer was not false because he entered the property within thirty days to store personal property and begin renovations. McDowell also asserts that Allstate never demonstrated that the thirty-day-occupancy question on the application was material to its decision to issue the policy, in part because the question conflicts with the terms of the policy.

The circuit court granted summary judgment in favor of Allstate's decision to rescind the policy. McDowell now appeals the summary judgment order. We reverse the order and conclude that questions of material fact exist regarding whether McDowell's answer to Allstate's thirty-day-occupancy question was false, and whether the question

1

was material to Allstate's issuance of the policy.  We also remand the case for further proceedings.

## I. Factual and Procedural Background

In May of 2019, plaintiffs McDowell and Deeanna Lawson[1] purchased a house located at 219 Highland Avenue in Oak Hill, West Virginia.  They paid $37,000 for the house.  McDowell contends that he and his wife, plaintiff Mary McDowell, stored personal property in the house.  This case involves insurance coverage on the house, and the facts revolve almost exclusively around McDowell.

Defendant Patrick O. Hambrick, Jr., is an insurance agent who sells policies for defendant Allstate.  McDowell asserts that he had known agent Hambrick for several decades prior to 2019, and agent Hambrick knew McDowell was "fixing up houses."  In mid-May, McDowell contends he had a discussion in a grocery store with agent Hambrick, and they talked about McDowell's purchase of and intent to remodel the Highland Avenue house.  Agent Hambrick said he was selling homeowner's insurance, and he gave McDowell a business card and said he would like to earn McDowell's business.

McDowell contacted agent Hambrick who asked McDowell questions that are not apparent from the record.  Based on that conversation, agent Hambrick prepared a "personalized insurance proposal" for a homeowner's insurance policy from Allstate for

---

[1] The parties do not explain the relationship between McDowell and Lawson, other than that they are co-owners of the house at issue.

2

McDowell.  It appears that, based upon the proposal, McDowell agreed to purchase an Allstate policy.  However, it is unclear from the record how the policy was obtained.

## A.  The Application

The focus of this appeal is an application for coverage, a six-page document with typewritten answers that was apparently electronically prepared on May 17, 2019, sometime after agent Hambrick prepared the proposal.  Allstate and McDowell have proffered two different versions of the application.  The version of the application proffered by Allstate has a blank on page four titled "Applicant's Initials" followed by "D. M."  There is also a blank on page six titled "Applicant's Signature" below the statement "I have read this entire application before signing."  The signature blank on page six of Allstate's version of the application contains the following printed text:

Signed by: DAMON MCDOWELL
Date: 2019.05.17  14:01:16 CDT

McDowell argues that he never initialed or signed the application and never saw it until some months later, after Allstate told him he had made misrepresentations on the application.  McDowell alleges that Allstate sent him a version of the application.  That printout of the application, proffered by McDowell, does not contain McDowell's initials, and it does not contain his printed signature.

Moreover, McDowell and Allstate offer two wholly different versions of the circumstances surrounding the completion of the application.  As we understand the record, McDowell contends that, on May 17, after he had spoken with agent Hambrick and

3

received the proposal for an Allstate policy, and while he was in the middle of reroofing a church, he received a telephone call from Lilly Hoover, an employee in agent Hambrick's office. McDowell recalls that Hoover asked him questions about the house. Furthermore, McDowell says Hoover "did some kind of Skype thing from a satellite" and told him the square footage of the house and told him the house's replacement value. McDowell gave Hoover a credit card number, Allstate charged a premium to the credit card, and a few days later he received documents showing he had insurance on the Highland Avenue house from Allstate.

Allstate counters that the purpose of the phone call was so that Hoover could complete the application using the answers given by McDowell. For instance, "dwelling information" on the application indicates that McDowell said the purchase price for the house was $37,000, but that he estimated its "current market value" was $300,000. However, the application also contains blanks filled with detailed information supplied solely by Allstate. In a section titled "Estimator" that used "Residential Component Technology (tm)," Allstate (not McDowell) identified the insured property as a two-story, single-family house built in 1921, identified the materials used to construct and decorate the house, and declared the house had 1,578 square feet of living area. On the application, Allstate placed the replacement cost of the house at $379,618. Significantly, the application contains the typed signature of agent Hambrick below this statement: "I have not inspected the premises." Allstate contends McDowell electronically signed the completed application after being given an opportunity review the document; Allstate does

4

not, however, identify how he was able to review the application or how the signature was obtained.[2]

In his deposition, McDowell argued that he would never have signed the version of the application proffered by Allstate, if he had seen it, because it contains errors. For instance, the application identifies the co-owner of the house (Lawson) as an "Occupant Non-Relative," despite her never intending to reside in the house. Conversely, the application omits McDowell's daughter who he asserts was going to reside in the house. The application also incorrectly states McDowell's wife's birthday, and McDowell insists he would never have signed an application where his wife was listed as being eighteen years younger than she really was.

Allstate's contentions center on one question in the May 17 application, and what it asserts is a misleading response by McDowell. Specifically, the application contains the following question and printed answer:

Will the residence be occupied within the next 30 days?: YES

---

[2] While Allstate contends McDowell electronically signed the application, McDowell points out that Hoover claimed in her deposition that she has seen McDowell's application "with his handwritten notes to it or handwritten signature on it[.]" McDowell complains that Allstate has never produced this handwritten version of the application, and instead produced only a version with typed answers, initials, and signatures.

Furthermore, for reasons we cannot discern, the circuit court made a finding of fact that McDowell "applied for a home insurance policy with Allstate . . . through the internet on a cellular telephone." App. R. at 4, ¶ 3. This finding is nowhere supported by the record on appeal and is not mentioned in either party's brief.

5

## B. The Parties' Dispute

Allstate sent McDowell a declarations page stating that it was providing homeowner's insurance coverage for the house, effective on May 18. The declarations page reflects that Allstate was providing coverage for "dwelling protection" with a limit of $379,618.[3] The declarations page lists McDowell and his wife as the "Named Insured(s)." The other owner of the house (Lawson) was omitted from the dwelling coverage.

The record suggests that, while none of the plaintiffs (Mr. or Mrs. McDowell or Ms. Lawson) began residing in, or sleeping at, the house over the next month, they did have articles of personal property in the house. Also, McDowell indicated that he did cleaning or repair work at the house (although the record is unclear as to its extent). Further, some utilities were turned on for the property, such as water service, sewer service, and garbage collection. McDowell asserts, however, that he did not have electrical service in the house, for two reasons. First, he says he intended to conduct repairs on the electrical wiring in the house. Second, McDowell contends that he hoped to dissuade certain intruders from staying in the house. McDowell states that relatives, friends, or associates

---

[3] The declarations page also reflects that Allstate provided $227,771 in "personal property protection." While the plaintiffs assert that they have personal property losses Allstate refuses to cover, the parties' arguments center on whether McDowell misrepresented that the house was "occupied" within thirty days. Consequently, we leave questions about the personal property to the circuit court for resolution on remand.

of the house's prior owner continued to break into the house, despite McDowell's efforts and appeals to law enforcement. These intruders even had their mail delivered to the house.

Twenty-five days after Allstate initiated insurance coverage on the house, on June 12, an Allstate contractor conducted an underwriting inspection of the exterior of the house. The resulting underwriting inspection report said the house calculated the replacement cost of the house at $295,552, but noted missing and broken windows, moss on the roof, and ivy growing on the siding and eaves. The underwriting inspector took photos and wrote that he could not complete his inspection, in part, because of appliances and debris in the yard.[4]

Days later, around two o'clock in the morning of June 20, a fire occurred, and the house and some of the contents were damaged.[5] Police officers assessed that the

---

[4] In her deposition, Hoover (the employee of agent Hambrick) asserts that she learned the results of the underwriting inspection on June 12. Hoover claims that, the next day, she spoke with McDowell and told him the house would not be covered by Allstate's insurance because it did not meet the company's underwriting standards. In the days thereafter (and before June 20), Hoover quit her job and moved to Mississippi. Allstate did not advise McDowell in writing of the results of the underwriting inspection until about three weeks later, during the first week of July.

[5] The record indicates that, after the fire, McDowell filed an inventory of millions of dollars' worth of personal property he claims he lost in the fire that included antique furniture, valuable coins, vintage Barbie Dolls, and irreplaceable baseball and football cards. While Allstate now asserts there was no evidence these items were ever present in the house, the plaintiffs suggest that Allstate refused to cover these items because they were excluded from coverage by the terms of the Allstate policy.

fire was started deliberately in three locations using rags soaked in a petroleum distillate.[6] The City of Oak Hill later sent a notice that the "structure cannot be reasonably repaired and should be ordered demolished."

McDowell promptly made a claim with Allstate. On June 20, the same day as the fire, Allstate wrote to McDowell with a claim number to let him "know that we received your claim and started working on it." The next day, Allstate emailed McDowell a missive that begins "Good news! Your claim payment is on its way," and advised McDowell it was depositing $1,000 onto his credit card for the "Fire Loss." Allstate appears to have later provided McDowell with living expense payments.

On June 26, a fire inspector visited the house on behalf of Allstate and confirmed that the fire had been intentionally set. The fire inspector took photographs which McDowell argues show his efforts to improve the condition of the house, namely that the appliances, debris, and some of the vegetation in the yard during the June 12 underwriting inspection had been removed.

Just over a week after the fire inspector's visit, and at least twenty-two days after the underwriting inspection, Allstate sent McDowell two conflicting letters. In the

---

[6] A next-door-neighbor told police she heard somebody coughing outside shortly before the fire was discovered. Police also found a clean, seemingly freshly dropped South Carolina driver's license on the sidewalk in front of the house during the fire. McDowell contends he gave police the names of intruders into the house. It is unclear what, if anything, the police accomplished with this information.

first letter (which is undated except for a notation that it used "Information as of July 04, 2019"), Allstate declared that the homeowner's insurance policy would be cancelled on "August 14, 2019 at 12:01 AM." The reasons given for the cancellation included that the "yard or porch has appliances, debris," and that there was moss, plant, and vegetation growth on the roof and exterior of the house. The first letter concludes that "your policy will remain in effect until the cancellation date and time shown above."

The second letter from Allstate (also undated except for a notation that it used "Information as of July 5, 2019") declared Allstate was confirming McDowell's "policy change." The second letter contained an amended declarations page that, confusingly, declares that Allstate was providing coverage "Beginning May 18, 2019 through May 18, 2020 at 12:01 a.m. standard time." Otherwise, the amended declarations page appears identical to the earlier declarations page and even maintains the same $379,618 in dwelling coverage.

This appeal arises from a third letter from Allstate to Mr. and Mrs. McDowell dated July 18, 2019. Allstate announced in the letter that, because of misrepresentations on the application regarding whether the house would be occupied within thirty days, Allstate was effectively rescinding the homeowner's insurance policy. Allstate's July 18 letter gave the following reasoning:

> It has been determined that material misrepresentations were made on the application as it relates to occupany [sic] of the home. You answered that you would be moving into the home in May 2019, and in fact it would be occupied within 30 days of the signed application, and neither occurred. The occupany

9

[sic] is directly correlated to the condition of the home at the time of the application. The home was not habitable at the time of the application, nor was it at the time of the loss. . . . Allstate would not have written the business had it known . . . that it would not be occupied within 30 days.[7]

Because it was rescinding the contract, Allstate declared that it was returning all premiums paid under the policy.

The plaintiffs (Mr. and Mrs. McDowell, and Ms. Lawson) sued Allstate and agent Hambrick for breach of contract and unfair trade practices.[8] After conducting

---

[7] Allstate's July 18 letter also notes that its "underwriting inspection of the home deemed the home was not a desireable [sic] risk" and that Allstate would not have issued the policy "had it known the pre loss condition of the home and property[.]" However, Allstate does not point to any question in the application where McDowell misrepresented the condition of the home. As noted earlier, after Allstate conducted its underwriting inspection it did seek to prospectively cancel the policy, effective August 14, 2019.

[8] Along with their complaint in September 2019, the plaintiffs note that they filed requests for production of documents and therein requested a copy of "the 'Application' upon which Defendant, Allstate, is relying[.]" Allstate produced what it contends is the "signed" application five months later, in February 2020. Before both the circuit court and this Court, the plaintiffs have argued that Allstate's version of the application is inadmissible because it was not produced within thirty days. As authority, plaintiffs cite to West Virginia Code § 33-6-6(c) (1957), which provides that

> no application for insurance signed by or on behalf of the insured shall be admissible in evidence in any action between the insured and the insurer arising out of the policy so applied for, if the insurer has failed, at expiration of thirty days after receipt by the insurer of written demand therefor by or on behalf of the insured, to furnish to the insured a copy of such application reproduced by any legible means.

The circuit court does not appear to have ruled on the plaintiffs' request to exclude the application. We leave it to the circuit court on remand to consider the plaintiffs' request.

discovery, the plaintiffs and Allstate filed competing motions for summary judgment. The plaintiffs asked for a ruling that Allstate was obligated to pay them under the policy; Allstate countered that the policy was void ab initio because of misrepresentations in the application. In an order dated July 6, 2021, the circuit court determined that there was no factual dispute that McDowell had made false and material statements on his application for insurance. The circuit court denied the plaintiffs' motion and granted Allstate's motion to rescind the policy.

The plaintiffs now appeal the circuit court's July 6, 2021, summary judgment order.

## II. Standard of Review

We review a circuit court's entry of summary judgment de novo. Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). We therefore apply the same standard as the circuit court, which is that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

### III. Discussion

The plaintiffs raise seventeen assignments of error on appeal.[9]  However, we distill these varied assignments down into one fundamental contention.  The plaintiffs

---

[9] Interlaced in the plaintiffs' muddled assignments are numerous assertions of clear errors in the circuit court's factual findings.  The most egregious among these are findings that the plaintiffs themselves started the June 20 fire.  The circuit court's order states that Allstate's policy excludes coverage for "intentional or criminal acts of or at the direction of any insured person[.]"  The order then finds that, "Specifically, Allstate has asserted that Plaintiffs intentionally caused the fire and/or conspired with others to do so[.]"  The order also finds that, in the July 18 rescission letter, Allstate said it "was denying Plaintiffs' claim . . . because the subject fire resulted from the intentional or criminal acts of, or at the direction of, the Plaintiffs, with the intent to cause the loss."  These statements in the circuit court's order are nowhere supported by the record.  Nowhere in the record does Allstate assert the plaintiffs caused the fire or conspired with others to do so.  Allstate's July 18 letter contains no such language that the plaintiffs engaged in intentional or criminal acts.  The police officers who investigated the fire did not charge the plaintiffs.

The plaintiffs also assert the circuit court's order erroneously finds that all utilities to the house "had been cut off prior to the fire[.]"  This finding is contradicted by documents in the record showing various utilities were connected.  Additionally, the order finds that McDowell verified the "condition of the dwelling" on the application, but plaintiffs point out the application contains no questions regarding the dwelling's condition.  Moreover, McDowell's statement that he paid $37,000 for a house that he valued at $300,000, and that Allstate valued at $379,618, might have warranted further investigation by Allstate.  *See*, *e.g.*, *Restatement of the Law of Liability Insurance* § 9, cmt. d (2019) ("[I]f there is something suspicious in an application that would cause an objectively reasonable insurer to undertake further investigation, the reasonable-reliance requirement would impose such a duty on the insurer."); 16 *Williston on Contracts* § 49:51 (4th ed. 2022) ("While an insurance company has the right to expect that applicants will tell the truth . . . if the representation is such that it would put a reasonable insurer on notice or create a duty of inquiry, and the insurer fails to further investigate, the representation is not considered to be untrue or material.").

We caution litigants that, when drafting a proposed order for a circuit court granting summary judgment, the order must set out factual findings that are "relevant, determinative of the issues *and undisputed*."  Syl. pt. 3, *Fayette Cnty. Nat. Bank v. Lilly*, 199 W. Va. 349,  484 S.E.2d 232 (1997) (emphasis added).

argue that the circuit court erred in finding that there were no questions of material fact surrounding whether McDowell's answer to the thirty-day-occupancy question was both false and material to Allstate's decision to issue the policy. McDowell argues that the circuit court erroneously found that Allstate had, as a matter of law, established its right to rescind the policy. We agree.

An insurer's right to rescind an insurance policy due to a misrepresentation in the insured's application for insurance is governed by West Virginia Code § 33-6-7 (1957), which provides, in part, that:

> Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless:
>
> (a) Fraudulent; or
>
> (b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
>
> (c) The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

This statute was "intended to codify the circumstances in which an insurance policy could be revoked for misrepresentations made in the application." *Powell v. Time Ins. Co.*, 181 W. Va. 289, 295, 382 S.E.2d 342, 348 (1989). "This language indicates that not all misrepresentations will avoid an insurance policy, but only those specifically identified in subsections (a), (b), and (c) of the statute." *Id.* at 291, 382 S.E.2d at 344, Syl. Pt. 3, in part.

13

In the instant case, Allstate relies on subsections (b) and (c) of West Virginia Code § 33-6-7.[10]

In a typical, non-insurance contract action involving a misrepresentation, the party seeking to avoid the contract must usually prove two separate facts: that the representation "was material and false," and that the party "relied upon it[.]" Syl. pt. 1, *Lengyel v. Lint*, 167 W. Va. 272, 280 S.E.2d 66 (1981). *See, e.g.*, Syl. pt. 2, in part, *McBee v. Deusenberry*, 99 W. Va. 176, 128 S.E. 378 (1925) ("The false representation of a material fact . . . on which the purchaser had the right to rely, and upon which he did rely, is always ground for a rescission of the contract[.]").

In the context of insurance, subsections (b) and (c) of West Virginia Code § 33-6-7 create a somewhat different approach to misrepresentations. A representation must, of course, be "material and false" in order to rescind a policy. However, subsections (b) and (c) blur the concepts of materiality and reliance: while an insurer may rescind a policy if there is a material misrepresentation, materiality is established by proof the insurer relied to its detriment on the misrepresentation. Hence, we gave this description of materiality in Syllabus Point 5 of *Powell*:

---

[10] If the insurer asserts the insured's misrepresentation, omission, or concealment of facts was fraudulent under West Virginia Code § 33-6-7(a), "then the insured's intent to deceive the insurer is clearly an element which the insurer must prove." *Massachusetts Mut. Life Ins. Co. v. Thompson*, 194 W. Va. 473, 478, 460 S.E.2d 719, 724 (1995); *see also* Syl. pt. 4, *Powell*, 181 W. Va. at 291, 382 S.E.2d at 344. In the instant case, Allstate does not assert fraudulent intent, so we need not weigh subsection (a) of the statute.

14

Under W.Va. Code, 33-6-7(b) and (c) (1957), in order for a misrepresentation in an insurance application to be material, it must relate to either the acceptance of the risk insured or to the hazard assumed by the insurer. Materiality is determined by whether the insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

181 W. Va. at 291, 382 S.E.2d at 344. Stated differently, "A misrepresentation by an insured during the application for . . . an insurance policy is material only if, but for the misrepresentation, a reasonable insurer in this insurer's position would not have issued the policy or would have issued the policy only under substantially different terms." *Restatement of the Law of Liability Insurance* § 8 (2019). In subsections (b) and (c), the materiality analysis focuses on "the impact the misrepresentation would have on the insurer's business judgment utilized in issuing the policy." *Massachusetts Mut. Life Ins. Co. v. Thompson*, 194 W. Va. 473, 478, 460 S.E.2d 719, 724 (1995).

Many commentators have said that the "[m]ateriality of a misrepresentation is perhaps the most difficult of all the elements to prove in an action for rescission." Robert J. Brennan, *Misrepresentation in the Application As the Basis for Rescission of a Property Insurance Policy*, 21 Tort & Ins. L.J. 451, 454 (1986). As one lawyer wryly noted, "[t]he matter of misrepresentation and concealment in obtaining insurance is at once the simplest and most maddeningly difficult of subjects," in part because of "the proverbial 'Serbonian bog' of rules and counterrules[.]"

The whole subject is made infinitely more difficult by the great differences in methods by which various branches of the insurance industry underwrite risks. Life insurers, for instance, commonly subject applicants to exhaustive questioning and examinations, signed and certified, while property insurers usually ask only the most rudimentary questions, often leaving it to clerical help, with no reliable method of proving who said what. *Any property insurance lawyer who has had to try to prevail in a swearing contest between an insured, whose smoking ruins have now sharpened his memory, and a secretary who left the agency eight months before, knows this predicament.*

Clayton H. Farnham, *Application Misrepresentation and Concealment in Property Insurance-the Elusive Elements of the Defense*, 20 Forum 299 (1985) (emphasis added).

Additionally, West Virginia applies an objective standard for materiality. In weighing the question of whether a misrepresentation was material, "W. Va. Code, 33-6-7 (1957), adopts the test of whether a reasonably prudent insurer would consider a misrepresentation material to the contract." Syl. pt. 6, *Powell*, 181 W. Va. at 291, 382 S.E.2d at 344.

Even innocent misrepresentations, if material, are sufficient to allow an insurer to rescind an insurance policy. "[N]either West Virginia Code § 33-6-7(b) nor (c) requires that an insurer prove the subjective element that an insured specifically intended to place misrepresentations, omissions, concealments of fact, or incorrect statements on an application in order for the insurer to avoid the policy." Syl. pt. 6, in part, *Thompson*, 194 W. Va. at 474, 460 S.E.2d at 720.

16

Furthermore, the burden is on the insurer to prove, by a preponderance of the evidence, that the insurance applicant made a representation that was untrue, and that the representation was material. Syl. pt. 7, *Powell*, 181 W. Va. at 291, 382 S.E.2d at 344. *See also Restatement of the Law of Liability Insurance* § 7, cmt. c (2019) ("The burden of proof with respect to each element of misrepresentation lies with the insurer.") In many cases, as support for its claim a misrepresentation was material, an insurer will offer an affidavit from an insurance company employee stating the insurer would not have issued the policy if the true facts had been known. *See*, *e.g.*, *Nationwide Prop. & Cas. Ins. Co. v. Brown*, 260 F. Supp. 3d 864, 873 (E.D. Mich. 2017) ("Courts routinely rely on affidavits attesting to the insurer's reliance on and materiality of statements in insurance applications[.]").[11] An insurer may also establish materiality by "present[ing] documentation concerning its underwriting practices, such as underwriting manuals, bulletins, or rules pertaining to

---

[11] While affidavits are common at the summary judgment stage, one court cogently explained that summary judgment should not be founded on an insurer's opinion evidence alone and said it could not "adopt a holding which provides that summary judgment must go to the insurer if the insurer's employee provides his employer with a favorable opinion in the requisite affidavit." *Case v. RGA Ins. Servs.*, 521 S.E.2d 32, 34 (Ga. App. 1999). "The test for materiality of a representation in an insurance application should not be based upon such procedural gaming, but must be grounded upon a weighing of whether the representation varied from the truth so as to substantially change the nature, extent, or character of the risk." *Id. See also Lee v. Mercury Ins. Co. of Georgia*, 808 S.E.2d 116, 128 (Ga. App. 2017) ("[A]n affidavit from an insurer stating that certain information omitted from an application was material does not automatically entitle an insurer to void a policy."); *Pratz v. Wayne Coop. Ins. Co.*, 724 N.Y.S.2d 293, 296 (Sup. Ct. 2001) (An "unsubstantiated and plainly self-serving" affidavit by an insurance company president that insurer would not have issued a policy was not supported by the insurer's "written policies, rules, directives, guidelines, manuals or any other such writings" used to "grant or deny an individual's application" or "to train or instruct" the insurer's employees or agents.)

17

similar risks, that show that it would not have issued the same policy if the correct information had been disclosed in the application." *Thandi v. Otsego Mut. Fire Ins. Co.*, 157 N.Y.S.3d 516, 518-19 (2022) (citation omitted).

Finally, under West Virginia Code § 33-6-7 (1957), the materiality of a misrepresentation on an application for an insurance policy is ordinarily a jury question. However, if the evidence excludes every reasonable inference except that the misrepresentation was material, then the question of materiality becomes one of law for the court.[12] Further, "both the truth of the insured's answers and the incorrectness of the

---

[12] *See*, *e.g.*, *Kambeitz v. Acuity Ins. Co.*, 772 N.W.2d 632, 640 (N.D. 2009) ("Fraud, intentional and material misrepresentation, concealment, and collusion are all generally questions of fact for the trier of fact."); *Nationwide Mut. Fire Ins. Co. v. Pabon*, 903 So. 2d 759, 767 (Ala. 2004) ("[T]he materiality of a misrepresentation on an application for an insurance policy is generally a jury question."); *Styzinski v. United Sec. Life Ins. Co. of Illinois*, 772 N.E.2d 888, 894 (Ill. App. 2002) ("Materiality is generally a question of fact[.]"); *Jackson v. Hartford Life & Annuity Ins. Co.*, 201 F. Supp. 2d 506, 513 (D. Md. 2002) ("The materiality of a misrepresentation is typically a question of fact for the jury, and the burden of proof lies with the party attempting to assert the defense. *John Hancock Mut. Life Ins. Co. of Boston, Mass. v. Adams*, 205 Md. 213, [220,] 107 A.2d 111, 113 (1954). Nonetheless, where materiality is shown by uncontradicted or clear and convincing evidence, the question may become one of law."); *Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp. 58, 65 (D.R.I. 1996) ("[T]he materiality of a misrepresentation by an insured in an insurance application is normally a question of fact."); *L. Smirlock Realty Corp. v. Title Guar. Co.*, 421 N.Y.S.2d 232, 237 (App. Div. 1979) ("Although materiality is ordinarily a question of fact, where the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine."); *United Fam. Life Ins. Co. v. Shirley*, 248 S.E.2d 635, 636 (Ga. 1978) ("Ordinarily it is a jury question as to whether a misrepresentation is material, but where the evidence excludes every reasonable inference except that it was material, it is a question of law for the court."); *Old Republic Ins. Co. v. Alexander*, 436 S.W.2d 829, 833 (Ark. 1969) ("The materiality to the risk of a fact misrepresented, omitted or concealed is a question of fact so long as the matter is debatable. It is a question of law only when so obvious that a contrary inference is not permissible."); *Smith v. Peninsular Ins. Co.*, 181 So. 2d 212, 217

Continued . . .

18

recording thereof without [the] insured's knowledge may present questions for the jury." 6 Steven Plitt, et al., *Couch on Insurance* § 85:64 (3d ed. 2022).[13] Moreover, "[a] disputed question whether the agent of the insurer was apprised of the true facts with regard to a particular issue, but failed without knowledge or collusion of the insured to put the information in the document sent to the insurer, is properly submitted to the jury." *Id.*

With these legal principles in mind, we now assess whether a triable issue of material fact existed for jury resolution. The plaintiffs contend that Allstate failed to establish, as a matter of law, that McDowell's statement regarding occupancy was either (1) false or (2) material. We agree and find that material issues of fact abound in the record.

We first examine whether genuine questions of fact exist regarding whether McDowell made a misrepresentation. On Allstate's application, McDowell allegedly answered "yes" to the question "[w]ill the residence be occupied within the next 30 days?" Most courts consider that whether a dwelling was vacant or unoccupied at the time of a loss is a question of fact. *Lundquist v. Allstate Ins. Co.*, 732 N.E.2d 627, 631 (Ill. App. 2000) ("[W]hether the subject dwelling was vacant or unoccupied at the time of the loss is a question of fact"). Courts interpreting insurance policies generally construe "vacant" to

---

(Fla. Dist. Ct. App. 1965) ("The general rule also seems to be established that the question of the increase in hazard is a question of fact for the determination of the jury.").

[13] *Couch on Insurance* also counsels that "[w]hether or not the insurer had knowledge of misrepresentations . . . so as to effect a waiver," or "whether the insurer had constructive notice of misrepresentations by virtue of its agent's conduct or knowledge," are also generally questions to be determined by a jury. 6 *Couch on Insurance* § 85:64.

mean "entire abandonment, deprived of contents, empty, that is, without contents of substantial utility." *Jerry v. Kentucky Cent. Ins. Co.*, 836 S.W.2d 812, 815 (Tex. App. 1992). *See also* Allen E. Korpela, *What Constitutes "Vacant or Unoccupied" Dwelling Within Exclusionary Provision of Fire Insurance Policy*, 47 A.L.R.3d 398, § 3(b) (1973) ("In a number of cases dealing with the question of what constitutes a vacant or unoccupied dwelling . . . the court has expressly defined the term 'vacant' as meaning generally empty or deprived of contents."). There is evidence in the record suggesting that, within thirty days of applying for insurance, the house was not empty or deprived of contents because the plaintiffs moved personal property into the house.

Further, there is evidence that, within the thirty days after applying for insurance, McDowell was visiting the house and conducting repairs and renovations to ready the house for habitation.[14] The record indicates that agent Hambrick knew McDowell

---

[14] Concerning the alleged renovations and repairs, we note that Allstate's July 18, 2019, rescission letter centered exclusively upon McDowell's allegedly false answer to the question whether he would be occupying the house within thirty days. Throughout this lawsuit Allstate has also asserted that McDowell falsely answered "no" to the question "Dwelling in Course of Construction" on the application because he otherwise admitted he was remodeling the house. Unfortunately, we do not know for certain if or how the question was orally posed to McDowell by Hoover, but, as it is presented on the printed application, the question is stated in the present tense. Hence, it seems to ask, when the application was supposedly completed on May 18, "Today, is the dwelling currently under construction?" If McDowell had not yet entered the house, and was planning to do repairs on future days, then his negative answer would seem true. Furthermore, the word "construction" in the insurance context is a term laden with ambiguity: some courts construe the term to apply only to newly constructed homes (*see, e.g.*, *Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 472 (7th Cir. 1986) ("[I]n an insurance policy, the term construction does not include repairs, maintenance, reconstruction, renovation and the like to an already existing structure."), while other courts construe "construction" as including

Continued . . .

20

renovated homes, and that McDowell told agent Hambrick (before either the insurance proposal or application were completed) that he was planning to renovate the Highland Avenue house.[15]  There is nothing in the application or in Allstate's policy that prohibits

---

renovations.  *See*, *e.g*., *Warren Davis Properties V, L.L.C. v. United Fire & Cas. Co.*, 111 S.W.3d 515, 522 (Mo. Ct. App. 2003) ("Construing the reasonable definition of construction in favor of the insured, we find that activities encompassing the renovation of a building are construction.").  As we discuss in the text, an ambiguous question usually will not evoke a material response.

[15] We note that the general rule is that an insurer is bound by the information acquired by its agent in taking an application, and the insurer is assumed to have at least constructive notice of what the agent knows.  *See generally*, *Restatement of the Law of Liability Insurance* § 5 (2019).  "Where the soliciting agent has knowledge of past conditions or existing facts which at the time would serve to void the policy, the company issuing the policy cannot insist upon such facts for the purpose of avoiding its liability."  Syl. pt. 2, *Kimball Ice Co. v. Springfield Fire & Marine Ins. Co.*, 100 W. Va. 728, 132 S.E. 714 (1926).  Hence, we have held that an insurance agent who issues a policy knowing a property will be vacant waives the insurer's right to assert an occupancy requirement:

> When a duly authorized agent of the insurer knows at the time the policy is issued that the building is vacant, and it was later destroyed by fire while vacant . . . , the provision of the policy that the insurer shall not be liable if the building is vacant or unoccupied for a definite number of days is waived by the insurer.

Syl. pt. 2, *McKinney v. Providence Washington Ins. Co.*, 144 W. Va. 559, 109 S.E.2d 480 (1959).  In *McKinney*, the insured sought a three-year fire insurance policy on a building and told the insurance agent "'the building was vacant and probably would be vacant during the duration of the policy, might be someone in it the next two weeks or months, or possibly during the duration of the three years,' and that the agent said 'that didn't make any difference.'"  *Id.* at 562, 109 S.E.2d at 482.  We concluded that

> [t]he weight of authority . . . supports the view that if an insurance company has knowledge, through its agent, when a contract of insurance is effected, that the premises are vacant or unoccupied, the issuance of the policy waives any provision

Continued . . .

21

renovations and repairs to a property. In the context of this case where McDowell claims he was initially entering the property to conduct renovations, the question "will the residence be occupied" appears ambiguous. The ambiguity is heightened because, in two places, the policy provides that "[a] dwelling under construction is not considered vacant or unoccupied." The general rule is an "insurer is not at liberty to deny coverage, after a loss has occurred, on the basis of an answer to an insurer's question that is ambiguous or too general to evoke a material response." *Hollinger v. Mut. Ben. Life Ins. Co.*, 560 P.2d 824, 827 (Colo. 1977). *See also Peterson v. USAA Life Ins. Co.*, 814 F. App'x 408, 411 (10th Cir. 2020) ("An insured is *not* responsible for misrepresentations made in response to an *ambiguous* insurance policy question."); *In re Tri-State Armored Servs., Inc.*, 332 B.R. 690, 710 (Bankr. D. N.J. 2005) ("[W]here an application question is ambiguous, the

_____

as to vacancy or nonoccupancy, at least so far as concerns the existing vacancy.

*Id.* at 564, 109 S.E.2d at 483. *See also Runner v. Calvert Fire Ins. Co.*, 138 W. Va. 369, 373-74, 76 S.E.2d 244, 247 (1953) (policy provisions may be waived by an insurance agent); *Medley v. German Alliance Ins. Co.*, 55 W. Va. 342, 357, 47 S.E. 101, 107 (1904) (insurer may waive, or be estopped from asserting, policy conditions and exclusions); *Effect On Provisions Of Insurance Policy As To Vacancy, Of Agent's Representations Made, Or Knowledge Acquired, Prior To Issuance Of Policy*, 96 A.L.R. 1259 (1935) ("The weight of authority appears to support the view that, if an insurance company has knowledge, through its agent, when a contract of insurance is effected, that the premises are vacant or unoccupied, the issuance of the policy waives any provision as to vacancy or nonoccupancy, at least so far as concerns the existing vacancy."). *But see Ashraf v. State Auto Prop. & Cas. Ins. Co.*, No. 18-0382, 2019 WL 2167960, at *5 (W. Va. May 20, 2019) (memorandum decision) (applying *McKinney* and finding insurer did not waive vacancy provision in policy).

ambiguity will be construed against the insurer and in favor of the truthfulness of the representation.").

Finally, the record is unclear as to whether McDowell ever made or affirmed *any* representation regarding occupying the property within thirty days. The record indicates that Hoover, agent Hambrick's employee, completed the application. McDowell contends he did not know he completed an application; he insists he answered questions from agent Hambrick, received a proposal for insurance that persuaded him to buy an Allstate policy, and then later answered questions by phone that were asked by Hoover, agent Hambrick's employee. Further, many of the blanks on Allstate's six-page application (such as those regarding the size or the replacement cost of the house) were completed using information supplied by Allstate, not McDowell. McDowell testified he has no recollection of seeing or signing the application, in person or electronically, and insists he would not have signed the application because of its errors (such as misstating his wife's age by eighteen years). Further, McDowell has proffered a copy of the application which does not contain his signature or initials, and which contradicts Allstate's claim that McDowell electronically signed and initialed the application.

Taken together, we find substantial questions of material fact exist regarding whether McDowell made a false representation about his occupancy of the house.

Second, there are significant questions regarding whether McDowell's response to the thirty-day-occupancy question in the application was material to Allstate's

decision to issue the policy. To begin, the record contains an affidavit from a "product and risk management litigation consultant" employed by Allstate, but the affidavit does not refer to the thirty-day-occupancy question on the application. The consultant opines that Allstate, "[b]ased upon its underwriting policies and procedures," would not have issued the policy if McDowell had "disclosed that the property had been acquired as an investment or 'flip' property," because Allstate "considers the occupancy of a home *as a primary residence* to be a material fact in determining whether or not to insure the proposed risk[.]" (emphasis added). Setting aside McDowell's claims (that while he intended to renovate the property as an investment, he might also have intended to live in the house with his family), absent from Allstate's affidavit is any opinion regarding whether or how the *thirty-day-occupancy* question was material to Allstate. Allstate's July 18 letter did not seek rescission of the policy because plaintiffs did not make the house their primary residence; it only sought to avoid the policy because "it would not be occupied within 30 days." Beyond the opinion affidavit of its employee, Allstate offered no written underwriting policies, manuals, guidelines, or other writings pertaining to the company's use of the thirty-day-occupancy question in assessing whether to issue a policy.

More significantly, McDowell points out that the application's thirty-day question cannot be material because it conflicts with both the language of the insurance policy and with the requirements of state law. As we noted earlier, in two places, Allstate's policy provides that "[a] dwelling under construction is not considered vacant or unoccupied." Again, factually, McDowell insists he told agent Hambrick he intended to

24

enter the property within thirty days to conduct "construction" in the form of repairs and renovations and insists he did enter the property to do so. Thus, he asserts his answer could not have been material to Allstate's decision to issue the policy.

But importantly, the policy contains a section called the "Standard Fire Policy Provisions" because West Virginia law requires those provisions. Specifically, West Virginia Code § 33-17-2 (1957) provides that:

> No policy of fire insurance covering property located in West Virginia shall be made, issued or delivered unless it conforms as to all provisions and the sequence thereof with the basic policy commonly known as the New York standard fire policy, edition of one thousand nine hundred forty-three, which is designated as the West Virginia standard fire policy[.]

Allstate's policy incorporates the "West Virginia Standard Fire Policy" and contains language that Allstate "shall not be liable for loss occurring . . . while a described building . . . is vacant or unoccupied beyond a period of *sixty consecutive days*." (emphasis added.) McDowell contends that Allstate's application impermissibly narrows the coverage provided in the Standard Fire Policy by shortening the allowable vacancy period from sixty consecutive days to only thirty days. It is axiomatic that any conflict between a statute and an insurance policy provision is resolved in favor of the statute. *Adkins v. Meador*, 201 W. Va. 148, 153, 494 S.E.2d 915, 920 (1997) ("When the language of an insurance policy is contrary to statute and therefore void, the policy should be construed to contain the coverage required by West Virginia law."); W. Va. Code § 33-6-17 (1957) (any insurance policy in conflict with state law must be construed as though it was in full compliance with the law). We leave for another day the assessment of whether the application's question is

25

in conflict with statutory requirements. Instead, we focus on whether the circuit court was correct in ruling that Allstate had shown, as a matter of law and by a preponderance of the evidence, that its thirty-day question was material under West Virginia Code § 33-6-7(b) and (c). On this record, we can only say that such a showing was not made, and we leave it to the factfinder to resolve whether the conflict with Allstate's statutorily required policy language rendered the question on the application immaterial.

In summary, we conclude that questions of material fact exist concerning whether Allstate's thirty-day-occupancy question was material to Allstate's decision to issue the policy to the plaintiffs.[16]

## IV. Conclusion

The record below shows there are genuine issues of material fact to be tried, and inquiry concerning the facts is necessary to clarify the application of the law. Accordingly, we find the circuit court erred in granting summary judgment to Allstate. The July 6, 2021, order is therefore reversed, and the case remanded for further proceedings.

Reversed and remanded.

---

[16] In addition to asserting the circuit court erred in granting summary judgment to Allstate, the plaintiffs also argue that the circuit court should have granted summary judgment in their favor. Because of the numerous questions of material fact and inferences in the record surrounding the application, we reject the plaintiffs' argument.